(5 Misc. Rep. 68.)

In re CLARK'S WILL.

(Surrogate's Court, Rensselaer County. August, 1893.)

1. WILLS—UNDUE INFLUENCE—PRESUMPTIONS.
   Undue influence cannot be presumed from interest and opportunity, but must be proven.

2. SAME—GIFT TO STRANGERS.
   Testatrix, during her last illness, having no next of kin, made a will in favor of her husband. A few days later, she made another will, giving the bulk of her estate to one C. It appeared that testatrix had no affection for, or confidence in, her husband, and that they quarreled constantly. She had great confidence in C., whom she always consulted about her business. *Held*, that a sufficient motive was shown for revoking the will in favor of her husband, and leaving her property to C.

Proceeding for the probate of the will of Mary A. Clark, deceased.

Clarence E. McNutt, for executor.

Robertson & Batchelder and John W. Roddy, for contestant.

LANSING, S. Mary A. Clark died on the 20th of October, 1892, at her residence in the city of Troy. At the time of her death she was about 65 years of age. The deceased left, her surviving, no relatives or next of kin. She was married to Colville G. Clark on the 7th of October, 1889, and lived with him up to the time of her death,—a period of about three years. Clark had previously been married, and had several grown children; and she had also been previously married, to a man by the name of Ayers. For about two years prior to her death, she had kept a small grocery in a portion of the house occupied by her and her husband. She had been ailing about a year, and for several weeks preceding her death was confined to her bed. The cause of her death was atrophy of the liver, with inflammation of the stomach. She had been under the care of a physician for about a month prior to her death. It was a case of gradual decline. She apparently died from exhaustion. For a number of days prior to her death, she was able to take but little nourishment, and showed little interest in anything. "Yet she knew everything that was going on, and would answer any question in an intelligent manner." So testified her physician, who visited her on the 13th and 18th of October prior to her death on the 20th. She left an estate consisting of household furniture, and $700 or $800 in the Albany Savings Bank. It appears that on the 10th of October, 1892, just 10 days before her death, she executed an instrument, in due form, giving all her property to her husband, and appointing him executor in her will. The will was drawn by a careful and intelligent lawyer,—Mr. Michael H. Myers,

of this city,—and was undoubtedly duly executed. Considerable testimony was given, tending to show that her husband was a person of intemperate habits and irascible temper, and that he had treated her very ill during their married life, and especially during her last illness, when he had, substantially, sole charge of her. It also appeared that he had endeavored to have her make a will in his favor during the latter part of her illness; that he at times persuaded, and at other times resorted to threats to accomplish this purpose. Mr. Myers, the draughtsman and witness to this instrument, states, that although she was "feeble, and very sick," and her husband came in once when "he thought he was under the influence of liquor," (at the time of the execution of the will,) yet he was of the opinion that she made the will, which he drew, voluntarily; that he inquired of her carefully, when alone with her, as to the disposition of her property, and he observed no appearance of restraint or duress. I have reached the conclusion, after considerable hesitation, that the deceased had yielded her assent to the disposition of her property made in said instrument,—whether for the sake of purchasing her peace for the remainder of her days, or because she had concluded, upon the whole, it was best to make that disposition of her property,—and I am inclined to hold the instrument sufficiently proven to admit the same to probate, unless it was revoked by the due execution of the later instrument offered for probate herein, but I think the assent given would be likely to be withdrawn for slight cause.

On the 15th of October, 1892, five days after the execution of the former instrument, another instrument was drawn (the instrument here offered for probate) by Joseph G. McNutt, of this city. Mr. McNutt went to the house of deceased at the request of William Myers, who was the landlord, and who, together with his family, occupied the upper floor of the house in which the deceased lived at the time of her death. By this instrument, after giving her husband all her furniture, (with the exception of a desk,) she gave her entire estate, which consisted of the $700 or $800 in the savings bank, to one James Cowen,—a person who was not a relative, though she called him, at times, cousin, but who was a friend of hers, and had been also of her former husband, prior to her marriage to Mr. Clark. It appeared she was accustomed to rely upon him for advice in the management of her business. This will was witnessed by Libby Shaw and Jennie Cowen, a married and an unmarried daughter of Mr. Cowen. This instrument is contested upon the ground that it was never in fact executed by the deceased; that at the time of its alleged execution the deceased was too ill to execute the same,—in other words, that the instrument was never presented to her for her signature; that it is, in fact, a forged instrument. I am satisfied that this defense cannot be maintained. Five persons, several of them among the best-appearing and most credible witnesses who were called to testify upon the hearing, (the two witnesses to the will, Mr. McNutt, the draughtsman, and Mr. William Myers and Mrs. Myers,) testified upon the subject, either of the execution of the will, or the presence of the witnesses at the

house upon that occasion and for that purpose. The defense is sought to be maintained by the testimony of George Clark, son of the contestant, and Maggie Reinhardt, a sister of Clark's first wife. I was not favorably impressed with the appearance or testimony of either of those witnesses upon the hearing, and especially that of witness George Clark. Mrs. Reinhardt, who was working for the deceased at the time, admits that she left the premises, and went home to get her husband's supper, about the time the other witnesses testify that the transaction took place. The weight of testimony is very greatly in favor of the execution of the will by the deceased, and at the time and in the manner stated by them. The testimony of George Clark and Maggie Reinhardt and her daughter, who came to the house on the 16th,—the day after the later instrument was executed,—was relied upon to show that Mrs. Clark was substantially in a comatose condition on or about the 15th of October, and was unable to understand and execute the instrument in question. But the same witnesses who testified in respect to the execution of the will, and also several others that visited the deceased during her illness, testified, in substance, that, while she was very weak and sick, yet she was able to understand what was said to her, and gave intelligent answers to questions addressed to her; and it further appears that, on the evening of the 15th of October, Mr. Cowen brought her some money, which he had drawn from the bank at her request, and gave it to her, saying that "he didn't want to keep it any more." She said, in reply, "I can mind it as well as anybody." I am satisfied from the testimony that the deceased had sufficient mind and memory to transact the business which she undertook to do by the execution of the instrument in question. There is no evidence in the case of any undue influence exercised by Mr. Cowen, either through himself, his family, or his friends, to produce the will in his favor. Although he called upon the sick woman occasionally during her illness, it does not appear that he saw her alone, or that he exercised, or attempted to exercise, any influence or employed any means, himself or through his friends, to induce her to make a will in his favor. Undue influence must be proven. It will not be presumed from interest and opportunity. There is no proof of undue influence in this case.

But the rule is invoked by the contestant that where it is sought to establish a later will by overthrowing a prior one, made by the testator when in health, under circumstances of deliberation and care, and which is free from all suspicion, when the subsequent will was made in feeble health, and in hostility to the provisions of the prior one, such prior will must prevail, unless the subsequent will is so fully proven to speak the testator's intentions as to leave no doubt in the mind of the court upon the subject. Delafield v. Parish, 25 N. Y. 35; Tyler v. Gardiner, 35 N. Y. 559. The rule invoked is a salutary one, and is well established, but it has no application to this case. The prior will was not made when the testatrix was in good health, and not made under circumstances of care and deliberation, nor is it free from all suspicion. The testatrix was very feeble and ill even at the time of the making of the

former will, and it is not by any means free from all suspicion of undue influence upon the part of its principal beneficiary. Besides, I am satisfied that the later instrument reflected the will of the deceased at the time it was made.

Again, the contestant invokes the rule that the law looks with suspicion and disfavor upon gifts made by will to a stranger, especially where to effectuate such gift requires the revocation of a will giving the property to persons who are the natural objects of testator's bounty, such as, in this case, her husband. It is undoubtedly true that in such a case the law requires ample explanation of the motive for the change in the disposition of the property, and such explanation is abundantly found in the facts and circumstances of this case. Notwithstanding the suspicion disclosed by the evidence in this case that the prior instrument was the result of undue influence upon the part of the beneficiary, the husband, yet I hold that she finally yielded her consent to that disposition of her property, but it was an assent that would require but slight circumstances to modify or change it. The testatrix, obviously, had little or no affection for Clark, and, if half the testimony is to be credited, he deserved none. They had been married but a short time. She said he deceived her in marrying him. It appeared that they quarreled constantly during her health, and the quarrel never ceased till her death. Clark was a drinking man, and, when drunk, was noisy and abusive. She stated to Mrs. Myers, who appears to have befriended her, and who visited her several times a day during her illness, and carried her delicacies, and even food, when her husband failed to provide for her, and who appeared to be an intelligent and credible witness, that Clark "wanted her to make a will, and she made it, but she was not satisfied. He was going around, having a good time." This was two days after the former will was made. Again, she testifies deceased "told me she wanted my husband to get her a lawyer to draw her will, because Clark was having a good time after her will was made." It is not very difficult to divine what the deceased meant by saying that "Clark was having a good time." Besides that, while she distrusted and quarreled with Clark, her husband, and did not trust him with her business, even while in health, she confided in Mr. Cowen, and intrusted him with her business, and had for many years prior to and after her marriage to Clark. Indeed, it appears that by the last instrument she was only carrying out a long and previously declared intention to give her property to Mr. Cowen. One of the witnesses testified that the deceased, prior to her marriage to Mr. Clark, showed her a paper, which she did not read, but which deceased said was her will, and that by it she had given all her property to Mr. Cowen, who was a friend of hers and her former husband. Other witnesses testified that the deceased expressed an intention of giving her property to her friend Mr. Cowen, during her illness, both before and after the first instrument was made. From all this, an easy and satisfactory explanation of the reasons which led the deceased to change her will may be readily discerned. An instru-

ment will not be refused probate, however sudden and complete the change of testamentary disposition may be, provided the change was made by a competent testator, for reasons which were to him satisfactory. In re Green, 67 Hun, 527, 22 N. Y. Supp. 1112. A person of sound mind and memory has a right to bestow his goods as he pleases, by will or otherwise, and the law is careful to guard that right. Neither will the fact that the instrument presented for probate gives a large portion of the estate to a stranger, to the exclusion of those who were the natural objects of her bounty, be sufficient ground for refusing probate to the instrument. In re Williams, (Sup.) 19 N. Y. Supp. 778. The real question in this case is not as to which of these wills is most satisfactorily executed, or which is most equitable in its provisions, although these are considerations that have weight upon the general issue; but the question, rather, is, was the deceased, at the time of the execution of the last instrument, of sound mind and memory, and free from all restraint or undue influence? If it satisfactorily appears that she was, then the later instrument, being the last testamentary disposition of her property, must be admitted to probate. From the best consideration I have been able to give this case, I am satisfied that the instrument bearing date the 15th of October, 1892, was duly executed by the deceased, and that she was at that time of sound mind and memory, and free from all constraint, and I therefore direct that it be admitted to probate. Let a decree be drawn to that effect.