(6 Misc. Rep. 484.)

### In re WAY'S WILL.

(Surrogate's Court, Rensselaer County. January 26, 1894.)

1. WILLS—PROOF OF EXECUTION.

An alleged will was drawn by one W., the wife and mother of the principal beneficiaries, who testatrix declared should not have any of her property. W. testified that she drew the will during the last illness of testatrix, secretly, because testatrix did not wish the fact known. This testimony was not corroborated, but, on the contrary, there was evidence that W. was not alone with testatrix at any time during her illness. The alleged will was not produced for several weeks after her death, and W. made statements inconsistent with possession of a will. There was also evidence that W. wrote the paper after testatrix's death. *Held,* that the evidence was not such as to satisfy the surrogate of the genuineness of the will and the validity of its execution, (Code Civil Proc. § 2622,) and probate would therefore be denied.

**2. SAME—WILL MADE IN EXTREMIS.**

Where it is sought to overthrow a will made while testatrix was in good health, and which is free from suspicion, by a later will, made during her last illness, and in hostility to the provisions of the prior will, the subsequent will must be so fully proven as to leave no doubt in the mind of the court.

## Proceedings for the probate of the will of Hester Way, deceased.

Two instruments are presented for probate: One bearing date September 9, 1885, to which is attached a codicil dated October 16, 1890. The other, known as the "brown-paper will," because written on a large sheet of common wrapping paper, is alleged to have been executed April 27, 1891. After application had been made by the executor named in the will of September 9, 1885, for the probate of said will and codicil, the brown-paper will was presented for probate. The proponent of the earlier will filed objections to the later instrument upon the grounds—First, that said instrument (brown-paper will) was never executed by the deceased,—was a forgery; second, that, if the signature attached thereto was actually written by the deceased, her mind did not accompany the act. No objection was made to the original will and codicil, except that they had been revoked by the execution of the later instrument. The two proceedings were consolidated, and heard together.

R. B. Stiles, Albert Smith, and George B. Wellington, for John See, executor of the first will and codicil.

C. E. Patterson, for Laura Weatherwax, executrix and proponent of the later instrument.

Charles F. Doyle, for Rufus Weatherwax and Peter Weatherwax.

LANSING, S.   Hester Way, a widow, aged about 63 years, possessed of property, mostly personal, of the value of about $12,000, died, after a lingering illness, from pneumonia, at Speigletown, in the town of Lansingburgh, in this county, on the 12th day of May, 1891. She left, her surviving, one brother, William Rufus Weatherwax,—whose wife, Laura, was the draughtsman and proponent of the "brown-paper will,"—and sisters, viz. Sarah Van Olinda, Mary Purdy, Margaret Strunk, and Catharine Button, and nephews and nieces, children of two deceased sisters. Mrs. Way's husband, Ira Way, had been dead about 14 years. Mrs. Way's illness commenced in the earlier part of April, 1891, before the 10th. She was visited by Dr. John Magee. On the 3d day of his attendance, he informed her that she was a "pretty sick woman," and asked her if "she had her will fixed as she wanted it," to which she replied, "I fixed that last fall, when I was in Lansingburgh." A professional nurse, Mrs. Hopkins, was called about the 14th of April, and remained with her until the 24th, when Mrs. Susan Lester, another professional nurse, took her place, and remained until Mrs. Way's death. Mrs. Hopkins testified as to her condition: "She was very sick, and talked but little. The least talk excited her, and there was nothing said to her." On the 16th of April, after Mrs. Way had been ill about a week, Mrs. Laura Weatherwax, having accidentally learned of the illness of Mrs. Way on that day, came to see her. She arrived in the evening, between 5 and 6 o'clock. She found at the house Mary Jones, the housekeeper, who had been with Mrs. Way 25 to 30 years; Mrs. Hopkins, the nurse; Miss Minnie Filkin, a niece. Mrs. Margaret A. Strunk, a sister of the deceased, arrived there shortly after

Mrs. Weatherwax. Mrs. Weatherwax and Mrs. Strunk sat up with the deceased that night, commencing about 9 o'clock, and remained with her until about 7 o'clock in the morning.    The deceased was lying in a small bedroom adjoining the dining room and the sitting room, a door from both of which opened into it.    Her attendants were accustomed to sit near the door, in one or the other of these rooms, during their charge of her.    Mrs. Laura Weatherwax testifies that shortly after her arrival she was informed by the deceased that she desired her to do some writing for her; that she wanted to make her will; that she had "nothing fixed satisfactory" to her.    She further testifies that about 9 o'clock, after all had retired except herself and Mrs. Strunk, she went into the bedroom, and off and on, during a great portion of the night, took dictations from her in regard to the disposition of her property, which she wrote upon small pieces of paper, backs of envelopes, etc., which she found at hand; that the matter which she took that night was about one-half of the body of the instrument, which appears, upon copying it, to be about eight pages of typewritten law cap; that the next morning, as she found opportunity during the day, (because this was to be kept secret,) she took further dictation from Mrs. Way, and the next night, in her room, with a pencil, she copied these various memoranda upon a large sheet of brown wrapping paper, which, she states, she brought with her from her own home, wrapped around some parcel.    She says she wrote until about 12 o'clock at night on the 17th, when she was taken ill, and went to bed.    She had quite a severe attack of the grip.    Her eyes were seriously affected.    It appears that the doctor was called in the next day, and visited her twice a day for three or four days thereafter.    He treated her eyes with cold applications and atropine, putting drops in the eye twice a day to dilate the pupils.    The last application was made on the 21st of April.    She testifies that on the 23d, and afterwards, as she found opportunity, when they were alone, she took further dictation from Mrs. Way, copying it in her room, and in out of the way places, upon this brown paper, until the morning of the 27th, when she had it substantially completed.    On that morning, early, her husband, Rufus Weatherwax, came over with Jennie Pelky, their daughter. Mrs. Weatherwax states that Mrs. Way then desired her to finish the instrument, and to have it executed and witnessed by her and her daughter.    She then wrote the concluding portion of the instrument directly upon the brown paper itself, instead of upon slips. After the instrument was finished, about 9 A. M., she states she brought it in, and commenced reading it to Mrs. Way.    After reading a half page, or thereabouts, the deceased stopped her, and said she knew what it was; she need not read further.    Thereupon, she and Jennie raised her up in bed, and Mrs. Way wrote the name "Hester," and then, complaining of her inability to see well, Mrs. Weatherwax gave her her spectacles, and she completed the rest of her signature.    Her hand was somewhat unsteady, and Mrs. Weatherwax took hold of her wrist to steady her hand while she was making the entire signature.    Mrs. Way then declared the instrument to be her last will and testament, and requested Mrs. Weatherwax.

and her daughter, Mrs. Pelky, to sign their names as witnesses, which they did in her presence.     The instrument which was thus executed commenced as follows:

"Explaining Memorandum.

"Speigletown, April 16, 1891.

"We reached here about 6 o'clock, and find that Hester Way had been very sick for one week, and it is only by accident we heard of it.   We came over as soon as it was possible for us to do so.   I scolded Mary Jones for not letting her friends know of her being sick. * * * I asked, 'Haven't you got everything fixed as you want it, and your will made?'   Hester says, 'I have nothing fixed as I want it.'"

After considerable more in this vein,—Mrs. Way urging her to prepare a will, and Mrs. Weatherwax suggesting that she should have a lawyer,—the instrument continues:

"I want some one to look after the ground, [meaning the burying ground.] If Danny, Peter, and Jenny will see to it, I will give them each $200."

Then follows what covers about six sheets of typewritten law cap, as copied from the brown paper.   By this instrument, her husband, Rufus Weatherwax, is given $4,000, (the precise amount of a note held by Mrs. Way against him,) and her son Peter property worth about $1,500, nearly one-half of the property being thus given to the husband and son of the draughtsman.   They took nothing by the former will and codicil.   The instrument concludes as follows:

"If Rufus comes after you, it must be signed before you go; and be sure to have Jennie around when Mary is out of the way, to the store, or for water.   I know what is in it, and don't read it over again; and you must both see me sign it, for I declare this to be my last will and testament, and if I never get well, or able to have it done by some one else. , And now, this 27th day of April, 1891, I, Laura A. Weatherwax, will finish it up, and Jenny Pelky will both of us sign it in presence of Hester Way, as witnesses, with her orders, in the town of Lansingburgh, Rensselaer county, N. Y.

[Signed]                                                    "Hester Way.
"Laura A. Weatherwax,
"Jennie A. Pelky."

The earlier will, which was made in September, 1885, and re-executed by her codicil in October, 1890, a few months before her last illness, was drawn by R. B. Stiles, a lawyer of Lansingburgh. Its execution, and that of the codicil, was duly proven, and her competency to make them was unchallenged.   No member of the Weatherwax family is mentioned in that will, except Peter Weatherwax, son of William Rufus and Laura, who is given the sum of $1,000.   By her codicil of October 16, 1890, she revokes this bequest to Peter Weatherwax.

A large amount of testimony was taken upon the trial, both in support of the brown-paper will, and of the allegations filed against it.

In support of the first ground of objection to the admission of the brown-paper will to probate, the contestants produced evidence tending to show that the instrument was a forgery.   Two gentlemen of large experience on the examination of handwriting and signatures, Dr. R. H. Ward and William E. Hagan, who have made

the subject a study for many years, and been frequently called to testify in important contests respecting genuine and simulated signatures, testified that they had examined the signature of Mrs. Way to the instrument in question, in connection with her genuine signature, and expressed the opinion that it was simulated. On the other hand, cashiers and tellers of several banks in this city were called, who examined the signatures in connection with the standards submitted to them, and each witness unhesitatingly pronounced the signature the genuine signature of the deceased. I have examined the signature carefully, and compared it with the standards, and it must be admitted that it is very like her genuine signature,—perhaps too much like those made years before, while in health; for it appears that Mrs. Way had been very ill at the time of the alleged execution of the will, for about three weeks, with a disease which had greatly reduced her strength. The testimony of her attendants is that, for some time prior to the 27th, (the date of the execution of the will,) she was so feeble that she was not able to raise her hand to her head, and that it required the assistance of two persons to give her medicine, and from 5 to 15 minutes to get her raised into a position to take it. It also appeared that, at that time, her right hand was considerably swollen. That she should be able to grasp the pen or pencil, and write her name with as firm an outline as when in health, although aided by another, is quite incredible. One would expect to see, from the description given of her physical condition, a signature with a much less definite outline than when written in health. But the testimony on this question is far from decisive on either side. Consequently, other circumstances, by way of corroboration or contradiction of the theories of the respective parties, are relied upon.

The contestants, in support of their claim that the instrument is a forgery, insist—First, that opportunity was wanting to prepare it; second, that the testatrix did not desire or intend to make any change in the former testamentary disposition of her property; third, that the conduct of Laura Weatherwax after the death of Mrs. Way is inconsistent with her statement that such an instrument had been executed by the deceased, and was in her possession; fourth, that there is positive proof that the instrument was made long after the death of Mrs. Way. It will not be necessary for me to discuss at length the testimony given in support and contradiction of these several positions. But a brief examination of the more important portions of the testimony along the lines suggested may aid in reaching a proper conclusion.

Upon the question of opportunity, which was regarded by the contestants and also by the proponent of the brown-paper will as very important, a large amount of testimony was taken. It is conceded by the proponent of the brown-paper will that there was a large amount of dictation, and considerable time was taken; for it covers, as I have before stated, both sides of a large sheet of wrapping paper, and makes seven and a half pages of typewritten legal cap. Mrs. Weatherwax states that she spent most of the first night in preparing the first half of the instrument; that she

took it from time to time, as Mrs. Way was able to talk, until that amount had been taken upon the slips of paper.    Mrs. Strunk and Mrs. Weatherwax, it will be remembered, sat up with the sick woman that night.    Mrs. Strunk testifies that Mrs. Weatherwax was not in the deceased's bedroom alone, except in company with her, except upon one occasion, and then for not longer than three minutes.    She testifies that she did not sleep any that night, and that there was no talking by Mrs. Way, or writing by Mrs. Weather-wax, during the night.    Mrs. Weatherwax, on the other hand, testifies that Mrs. Strunk was in the sitting room or parlor, lying upon the sofa, or reading newspapers,—Worlds and Journals,—about 8 or 10 feet away, during the night, while she was taking this dictation.    The story of one of these witnesses is obviously un-true.    Concededly, the deceased was very feeble, and Mrs. Weather-wax herself testifies that it required the help of both to give her medicines and wait upon her during the night.    The nurse who attended her during the day testifies:    "I never saw a person more feeble.    I thought she wouldn't live from one day to another.    She didn't seem to notice anything in the room, or make any observa-tion,—to want anything."

Mrs. Lester, the last nurse, arrived on the 24th of April.    She says she recollects well Mrs. Pelky's coming over with her father on the morning of the 27th.    She never had seen her before.    Mrs. Lester says she was with the deceased, in the bedroom or in one of the rooms adjacent, into which it opened, from the time Mrs. Pelky ar-rived, that morning, until Mrs. Weatherwax returned with her hus-band, about noon; and she states positively that Mrs. Way was not gotten up in bed, and did not execute a paper, that morning, which was concededly the only occasion when it could have been done, as described by Mrs. Weatherwax and her daughter Jennie.    On the other hand, Mrs. Weatherwax and her daughter, the reputation of neither of whom is directly assailed, both positively testify,—Mrs. Weatherwax, to the preparation of the instrument in the manner and at the times described by her; and Mrs. Pelky, to the execu-tion of the instrument.    Upon the whole, it may be said, upon this question, that while it is possible, perhaps, that the instrument should have been prepared and executed in the manner described by the witnesses, yet the great length of the instrument, the im-mense number and detail of its provisions, the concededly serious illness of the deceased, and her inability to undergo much labor or fatigue, and the positive testimony of Mrs. Strunk and the nurse Mrs. Lester in regard to the making and execution of the will, mili-tate very greatly against the proponent's theory of the production of the instrument.

Upon the next question, as to whether the testatrix desired to change the testamentary disposition which she had formerly made of her property, considerable uncontradicted evidence was taken. Dr. Magee testifies that upon the third day of her last illness he said to her, in substance, that she was a "very sick woman," and asked her "if she had her will fixed as she wanted it."    She said: "I have.    I fixed that last fall, when I was in Lansingburgh."    At

the time Mrs. Way was in Lansingburgh, (the fall of 1890,) she stated to Mrs. Strunk,—so she testifies,—as follows: They [Mr. and Mrs. Weatherwax] both abused me, and they have got all they will ever get out of me." Mary Purdy says that on the 7th of April, 1890, a couple of days before Mrs. Way was taken ill, she stayed at her house overnight, and in a conversation with her she said, speaking of Rufus Weatherwax, Laura Weatherwax, and the son Peter, "They had been paid for all they done for her." Witness said, "Why don't you fix your business so it will be fixed right, and there be no trouble afterwards?" She said, "I have fixed it, and they have got all they will ever get." She said they were very greedy in accumulating property, and they would try and do most anything for it,—to get anything they could. She said "they misused her and abused her, many times, in conversation." Mrs. Button, another sister, testifies that on the 28th of April,—the day after the alleged brown-paper will is alleged to have been made and executed,—deceased told her she had her will made,—she made it about six years before,—and added: "I haven't willed Peter anything, nor Rufus anything, nor neither of his family. I made a little change in it last fall, at Mr. Stile's office, when I was at Mrs. Strunk's. I suppose they will be very mad about it, but I wouldn't be here to know it." This testimony is perhaps more strictly applicable to the issue of fraud or undue influence. But it seems to me it is entitled to some weight, where the factum is so greatly involved in doubt. If this testimony is credited, it tends strongly to show that the testatrix never had the disposition that would warrant the inference that the brown-paper will emanated from her mind.

Another consideration urged with great force by the contestants of the brown-paper will is that the conduct of the draughtsman and proponent of that instrument after the death of Mrs. Way was entirely inconsistent with her statement of the production and her possession of the instrument. It appears that, on the day after the funeral of the deceased, Mr. John See, the executor named in the will and codicil, called at the house of the deceased, and in the presence of Mrs. Weatherwax, her husband, Rufus Weatherwax, Mrs. Strunk, and Mrs. Button, sister of the deceased, asked Mrs. Jones, the housekeeper, for the papers of the deceased, stating that there was a will, and he was the executor named therein. Thereupon, Miss Jones went in the bedroom, and produced certain papers, including the will. He also inquired for the money of the deceased. Mrs. Weatherwax and her husband were sitting on the sofa, and said nothing. No statement was made that she had another will in her possession, or that the deceased had made another will. This occurrence is proved by several witnesses. At first it was positively denied by Mrs. Weatherwax. In answer to the question of her counsel she said: "I was not present, and heard nothing of such a conversation. Q. Did any part of that ever take place in your presence or hearing? No, sir." Subsequently, she admitted on cross-examination that she was present at a conversation on the

day of the funeral, when Mr. See said he had Mrs. Way's will, and was the executor in the will, and, if those interested wanted to see the will, they must go to Troy. It appears that her husband went to Troy the next day, and came back to Mrs. Way's house. Mrs. Button, Mrs. Weatherwax, and Mrs. Purdy were there. Mrs. Weatherwax asked him how the will was, and he said it was "such a mixed-up mess" he couldn't tell. But it is apparent the will was not satisfactory, for Mr. Weatherwax said "that if the girls would go in they would break the will." Nothing was said in that conversation by Mrs. Weatherwax, to her sisters and husband, about there being a later will. Mrs. Weatherwax testifies that the reason she did not say anything about a will, on the occasion when Mr. See stated that Mrs. Way had made a will, and he was executor, was because she was so surprised that there was another will. On another occasion, she testified the reason she did not speak of it was that she did not know whether the instrument she had prepared was a will or not until she had had it examined by her counsel. But I find she stated upon her cross-examination, at the commencement of the hearing, that she supposed the instrument she had prepared would be a will, if the testatrix did not recover from the illness or revoke it. In accounting for her husband's silence upon these several occasions, she testified that she had not yet told him of the making of the brown-paper will, and did not tell him until a week after the funeral. It appears that Mr. and Mrs. Weatherwax called upon Mrs. Strunk in June, (Mrs. Way having died on the 12th of May.) At that time something was said about the will, and Mr. Weatherwax said, "If we all join together, I think I can break it all to pieces." This was after the citations were out for the proof of the first will. Mrs. Strunk replied, "I haven't got any money to spend in law." When Mrs. Weatherwax got up to go, she said to Mrs. Strunk, "You know we sat up that night, and you might have been asleep." Nothing was said by Mrs. Weatherwax about her having a will at that time. It is certainly a very extraordinary fact that Mrs. Weatherwax should not have disclosed the existence of this will, even to her husband, until a week after the funeral, and not to her husband's sister, who lived at Lansingburgh until some time in June. Indeed, her whole conduct after the death of Mrs. Way is difficult to explain consistently with the fact that she believed that she had in her possession the last will of deceased.

The final ground urged against the factum of the will is that there is proof positive that the will was fabricated by Mrs. Weatherwax weeks after the death of Mrs. Way. The testimony of one Flora Williamson is relied upon, in part, to establish this fact. She testified, in substance, that she was a servant living in the family of Rufus Weatherwax. That after the funeral of Mrs. Way, some time in June, she saw Mrs. Weatherwax and her daughter Jennie Pelky upstairs, with a paper corresponding to the brown-paper will in court, which she saw had a hole in it, as appears in the will, and upon which she saw the word "Hester" written near the top. She

says three or four lines only had been written on the instrument when she saw it. She subsequently saw it under the tablecloth, on the table. Witness testified that she heard Mrs. Pelky complain to her mother that she was not getting her share; she thought she should have as much as her brother Peter. All this is, of course, denied by Mrs. Weatherwax and by her daughter. And the proponent of the later will further assails this testimony by showing by the cross-examination of Miss Williamson, and by other testimony, that it must have been in July that she saw the brown paper described by her at the house of Mrs. Weatherwax, not earlier than the 12th, which was after the instrument now in question was in the office of Warren & Patterson. But Miss Williamson was recalled, and stated that the time of seeing this paper was some time before the 17th of June, and she stated some facts and circumstances in support of her recollection. It must be conceded that this testimony, alone, lacks conclusiveness, and falls short of establishing the charge. But it seems to me that this testimony is supported, rather than contradicted, by the subsequent explanation of Mrs. Weatherwax,—that, while she did have a sheet of brown paper similar to the one in question, upon which she was writing at her house while Miss Williamson was there, her object in writing upon it was to prepare a copy of the will for her sister-in-law Mrs. Purdy, who lived at Cornell, N. Y., who had sent to her for a copy in July. She says she was writing from memory, and putting it upon brown paper because she wanted to make it as near like the original as possible; that she wrote four or five pages or folds of the sheet, and then, having become dissatisfied with it, destroyed it, and subsequently sent to a store which was near by, and got some white paper, and made a copy from the typewritten copy of the brown-paper will furnished her from Mr. Doyle's office, and sent it to her sister-in-law.

But there is, to my mind, other evidence in the case, which is not disputed, which tends strongly to support the charge that this instrument was not in existence at the death of Mrs. Way. It is contained in a letter dated June 21, 1891, written by Mrs. Weatherwax to her sister-in-law Mrs. Purdy. The material portion is as follows:

"Crescent, June 21, 1891.

"Dear Folks: We have not seen Mag [Mrs. Margaret Strunk] or Kate [Mrs. Catharine Button] since you were there, [Mrs. Purdy was at the deceased's funeral,] and have not been to Speigletown since John See brought the citations here, but Rufus did not ask a question. Sarah [Mrs. See] says that Kate [Mrs. Button] told her that Het [Mrs. Way] asked to have a lawyer sent for, but Mary Jones said, 'Hester, tut! you don't want any lawyer,' and she said no more. Did Kate tell you? And, if she did, how long was it before Hester died? I was there all the last week before she died. I heard nothing of it, although she might have said it; and I think she did, from all Hester said to me. But I don't think Kate done right to let it drop because Mary banged at her. If Kate had told me, I wouldn't have dropped it until he was sent for. Rufus thinks, if the will holds good, everything will be sold to the highest bidder; but he thinks he can find cause to raise objections that will make a postponement so it can't be finished the 7th of July, [the return day of the citation.] I believe Hester knew but very little, if any, what the will contained. There is one little bit of it that makes John See and Mary Jones ashamed; that is, to sell all her things, and underclothes, too. But Ruf declares, if they do sell anything she gave

away, they must sell all. I hope you will be able to come up, if it is neces-
sary. Write, and tell us all that Kate told you about what Het said to her
before she died. * * * Laura."

The statements contained in this letter, to my mind, are utterly inconsistent with the existence and possession of the instrument in question by the writer upon the day the letter bears date. She is writing to her sister-in-law, whom, from the other testimony in the case, it appears, she supposed to be in entire sympathy with her. She reproduces her husband's threats of a contest; queries, in substance, whether anybody had heard the deceased say, during her illness, that she wanted to make a will, or was dissatisfied with her former will; and states that she had heard nothing of it, but, if she had, she would not have let it drop. All this, coupled with the other facts, that at that time (June 21st) neither her husband nor Kate, (Mrs. Strunk,) his sister, had been informed of the alleged will, goes far, in connection with the testimony of Flora Williamson, to support the conclusion that the later will was not then in existence.

But it is not necessary to determine that question, absolutely, in this case. It is sufficient to say that the gravest doubts arise from the evidence in regard to the genuineness of the alleged will, and in such a case I am admonished by the statute that it is my duty to refuse probate to the will. Code, § 2622, provides:

"Before admitting a will to probate, the surrogate must inquire particularly into all the facts and circumstances and must be satisfied of the genuineness of the will and validity of its execution."

This doctrine has also been frequently approved by the highest court in this state. In the case of Delafield v. Parish, 25 N. Y. 35, the court says:

"It is not the duty of the court to strain after probate, nor, in any case, to grant it, where grave doubts remain unremoved, and great difficulties oppose themselves to so doing."

And it has been further held by the same court, upon the question of the burden of proof:

"A party who offers an instrument for probate as a will must show satisfactorily that it is the will of the alleged testator, and upon this question he has the burden of proof. If he fails to satisfy the court that the instrument speaks the language and contains the will of the testator, probate must be refused." Rollwagen v. Rollwagen, 63 N. Y. 518.

Another ground is urged by the contestants of the later instrument for its rejection, namely, that if it shall be held that the signature to the instrument is genuine, and that it was executed with all due formalities, still it must be further shown by the proponent, in this case, that the mind of the testatrix accompanied the act, which it is insisted does not appear. I will consider this defense briefly, since much reliance has been placed by the proponent upon the evidence produced of the genuineness of the signature of Mrs. Way to the instrument in question. Concededly, the will was drawn by one greatly interested; two of the principal beneficiaries therein being her husband and her son. The proof is that the deceased entertained no very friendly feelings for any member of the Weatherwax family, down to the time of her illness, with the ex-

ception, perhaps, of Jennie Pelky, who was given little or nothing in either will.   One week had elapsed after her severe attack, and the doctor and the hired nurse were in attendance, and yet her brother's family had not been notified of her illness.   They learned it accidentally.   Concededly, the alleged will was gotten up surreptitiously, and executed by stealth, if it was executed.   The alleged testatrix was very weak and sick, so that she was scarcely able to speak, at the time of the alleged drafting and execution of the will.   Concededly, this alleged will gave a large portion of her estate to persons who were entirely ignored in the former will. The former will was made when in full health, after mature deliberation; drawn by a lawyer, and executed with all due formalities. It had remained for six years, when the testatrix decided to make a change, and that change was to eliminate the legacy to Peter Weatherwax, the only member in the Weatherwax family mentioned in the will.   The act appears to have been done advisedly, and the will remained as the deliberate expression of her desires as to the final disposition of her property, at least down to the third day of her illness in April, 1892, as testified by Dr. Magee.   Under these circumstances, the rule is invoked by the contestants that, where it is sought to establish a later will and overthrow a prior one,—the prior will made when the testator was in health, and under circumstances of deliberation and care, and which is free from all suspicion; the later will made when in feeble health, and in hostility to the provisions of the prior one,—such prior will must prevail, unless the subsequent will is so fully proven to speak the testator's intention as to leave no doubt in the mind of the court on the subject.   Delafield v. Parish, 25 N. Y. 35; Tyler v. Gardiner, 35 N. Y. 559; Rollwagen v. Rollwagen, 63 N. Y. 518; Weir v. Fitzgerald, 2 Bradf. Sur. 42.   The rule invoked is a salutary one, and I think applies to this case.   The testatrix was very ill; the later instrument, secretly drawn and executed, was in hostility to the provisions of the prior one, made when the testatrix was in health; and there is not a single important fact or circumstance shown in corroboration of the testimony of the two witnesses to the later will, or that tends to show that the deceased either made or understood the later will, or even desired to change in any respect her former will.   I think the language of Surrogate Bradford in Weir v. Fitzgerald, supra, quoted with approval by the court in the Rollwagen Case, aptly applies to the defense in this case.   The learned surrogate says:

"Something more is necessary to establish the validity of the will in cases where, from the infirmity of the testator, his impaired capacity, or the circumstances attending the transaction, the usual inference cannot be drawn from its mere formal execution.   In such cases, additional evidence is required that the testator's mind accompanied the act; that he knew what he was executing, and was cognizant of the provisions of the will."

Satisfactory evidence of this kind not having been produced in this case, probate of the will must be refused on this ground also.

The question of costs is largely in the discretion of the surrogate, and it is his duty to allow costs to the executor named in a will,

who has in good faith, and in pursuance of the duty cast upon him by the testator and by the law, presented the will for probate, even though the same may be rejected. But in this case I certainly could not, consistently with the views which I entertain and have expressed, allow costs to the proponent of the brown-paper will. No costs will therefore be allowed her, but costs will be allowed to the executor of the will of October, 1885, payable out of the estate. Let findings be prepared and a decree be drawn admitting the will of 1885 and codicil of 1891 to probate, and refusing probate of the brown-paper will, of the date of April 27, 1891.