---

(27 Misc. Rep. 417.)

## In re BARBINEAU'S WILL.

(Surrogate's Court, New York County. May, 1899.)

WILLS—TESTAMENTARY CAPACITY—EXECUTION IN EXTREMIS.

In a proceeding upon the probate of a will made while the testatrix was on her deathbed, witnesses for the proponent testified that the will was read over to decedent, and that she said "Yes" in answer to the questions touching its execution. She was too weak to write, although a good penman, and her hand was guided as she made a cross. It was shown that two of the witnesses had signed statements that she was speechless; that she made no declarations, and seemed entirely unconscious of what was going on. Her physician testified that she was in a state of coma for three days before it was signed, and had not been rational during those days; that he visited her twice on the day the will was signed, and she took no notice of him. The will in question was hostile to a prior will, by which decedent had devised her property to her husband, with whom her relations had always been pleasant, and who was her constant and faithful attendant during her illness. The later will was drafted from oral instructions given by proponent and his wife. The proponent persuaded the husband to go out walking, and, while the two were away, the later will was executed, without the husband's knowledge. Held, that testatrix was not competent to make the later will.

Proceedings upon the probate of a will. Probate refused.

Thomas W. Burke (James A. Gray, of counsel), for proponent. Jeroloman & Arrowsmith, for contestants.

VARNUM, S. The trial herein was conducted before Surrogate Arnold, and it has now been stipulated that the case be decided by me without a new hearing. The importance of the issues involved, together with the great number of conflicting statements scattered

through the voluminous testimony that was taken, have caused me to feel keenly the disadvantage of being compelled to weigh evidence without seeing and hearing the witnesses who produce it, and I have therefore been at pains to give the minutes and the exhaustive briefs submitted the most careful study before arriving at my decision. Decedent died on May 15, 1894. She married the contestant in 1887. During the three years prior to her death she invested the greater portion of her funds in Western securities, and her husband, at the same time, made similar investments on his own account. Not only did they thus engage in their business ventures together, but they likewise were in perfect accord with each other on all other subjects, so that their married life was marked by the most complete cordiality and harmony. The record discloses several attempts to show that latterly decedent felt displeasure at her husband, but all of these failed completely. There can be no doubt that the pleasantest companionship existed between this husband and wife. In 1890 decedent, then being in possession of her entire faculties, made a will. She went about the matter deliberately, with the aid of her own attorneys, and without advice from or consultation with contestant. She had no children or remoter descendants. Her only relatives were a brother and four sisters, with none of whom, excepting perhaps the former, she was particularly intimate. The one who was nearer and dearer to her than all others was her life companion, and it was therefore natural and proper that, after giving a small legacy to her brother, she devised her entire property to her husband. This will was kept by decedent in a trunk in her room and was never destroyed. The instrument that is now offered for probate is dated and alleged to have been executed on May 3, 1894, 12 days before the death of decedent, and while she was in a state of enfeebled health. Under its terms, the testatrix gives her property to her brother, sisters, and husband in equal shares, appoints her brother the sole executor, and directs that, in the event of any beneficiary contesting the will, his or her share shall be divided among the others. The husband became the sole contestant.

It will be observed at the outset that we have here a case where a prior will, made while the testatrix was in good health and under circumstances of deliberation and care, is sought to be overthrown by a later will, in hostility to the provisions of the first instrument, and made while the testatrix was on her deathbed, weakened by disease. Under such circumstances, the court will inquire most minutely into all the concomitant circumstances touching the execution of the second testament, and will require the proponent to clearly show that the testator was fully cognizant of his acts and reflected his intentions in the will offered for probate. In re Way, 6 Misc. Rep. 484, 499, 27 N. Y. Supp. 235; Forman v. Smith, 7 Lans. 443, 445; In re Clark, 5 Misc. Rep. 68, 73, 25 N. Y. Supp. 712; Booth v. Kitchen, 3 Redf. 52; Tyler v. Gardiner, 35 N. Y. 559. It appears that decedent's last illness began in the fall of 1893. She suffered from a pelvic abscess. Eventually, meningitis set in, and became the immediate cause of her death. During the long course of this sickness, she suffered intense pain, which was finally relieved only by the almost

continual use of opiates.    Her husband was a constant and faithful
attendant.    As a nurse to his dying wife, he performed services, ren-
dered necessary by the dread nature of her illness, which would have
strained the loyalty of any man to the utmost, and yet he did these
things uncomplainingly and with beautiful devotion.    There was no
estrangement, no quarrel, no disagreement.    How, then, can the
remarkable change of intention that decedent underwent be ex-
plained?    The direct evidence on the subject is furnished mainly by
proponent's wife.    She testified that, in the fall of 1893, decedent in-
formed her that she desired to alter her will so as to have it read
like one made by an uncle, who divided his property equally among
brothers and sisters; that nothing more was said until about May 1,
1894, at which time decedent said that her end was near, and asked
that a lawyer be employed to draw up a new will.    This is substan-
tially all the light that was shed on this subject.    Thereupon an
attorney, who had performed services for proponent, was employed,
and the instrument now offered for probate was drafted from oral
instructions given by proponent and his wife to this attorney.    We
now come to the eventful evening of May 3d.    Proponent's wife testi-
fied that decedent said that she did not want her husband to know
of the proposed change in the will, as she could not, in such an event,
live with him, and that she wanted him away from the house at the
time the will was to be signed.    Whether or not decedent made these
statements, the fact remains that on this evening the proponent per-
suaded the contestant to go walking, and that, while the two were
away, the alleged execution of the will took place.    Contestant knew
nothing of this second testament until his wife was dead.

We are now confronted with the important inquiry as to the
decedent's mental condition on the evening in question.    Here I find
the testimony most conflicting.    Proponent's witnesses say em-
phatically that the will was read over to decedent, and that she said
"Yes," to the usual questions as to whether that was her will and
whether she desired the subscribing witnesses to act.    She was so
weak that she could not write, although an excellent penman, and
the attorney wrote her name and guided her hand as she made a
cross.    On the other hand, it was shown that two of the subscribing
witnesses had signed statements in which they aver that decedent
was speechless; that, upon questions being asked, she uttered sounds
like, "Ah, Ah;" that she made no declaration of any kind, and seemed
entirely unconscious of what was going on about her.    The attempt
to explain away the force of these statements must be characterized
as most unsuccessful.    Furthermore, the physician who regularly at-
tended decedent testified that his patient was in a condition of coma
during three days before Thursday, May 3d; that she had not been
rational since the Monday before that Thursday; that he visited her
twice on May 3d, and that she did not take any notice of him what-
ever on either occasion.    He could not positively state what her
condition was a few hours after his second visit, at which time the
alleged will was signed.    He testified, however, that while it might
have been possible that she understood what was going on, yet, from
his knowledge of her condition, he believed that this was extremely

improbable. From a careful perusal of the testimony offered on this point, which I do not deem it necessary to further review, I find that a grave doubt remains in my mind as to whether decedent was rational on the evening of May 3d, and whether she had any knowledge whatever of the contents of the paper to which she affixed her cross. And this doubt is intensified when I take into account the peculiar circumstances surrounding the entire transaction. In view of this fact, I do not deem it essential to pass on the issue of undue influence, and I shall rest my decision of the matter entirely on the issue of testamentary capacity. Aside from the salutary rule laid down in the case of In re Way, supra, it rests upon the proponent of a will to satisfy the court of the mental soundness of the testator's mind. Delafield v. Parish, 25 N. Y. 9. It is true that this case has been cited in support of the proposition that the burden of proof is upon him who alleges testamentary incapacity. Dickie v. Van Vleck, 5 Redf. Sur. 284, 286; Miller v. White, Id. 320. The better opinion, however, is that, if, upon the whole case presented, the judicial conscience is in grave doubt as to whether or not the testator was mentally sound, that doubt must be resolved in favor of the contestant. Undoubtedly there is a presumption, mostly one of fact, that every man is sane, and that presumption materially assists the proponent in carrying the burden that is upon him, but it does not relieve him of it (Rollwagen v. Rollwagen, 63 N. Y. 504; Cooper v. Benedict, 3 Dem. Sur. 136; In re Lissauer's Will [Sur.] 5 N. Y. Supp. 260; In re Flansburgh's Will, 82 Hun, 49, 50, 31 N. Y. Supp. 177); and this view reflects the meaning of section 2623 of the Code of Civil Procedure. Upon consideration of the entire evidence, I have not been satisfied that the decedent was competent to make a will on the 3d day of May, 1894, and probate of the instrument bearing date and alleged to have been executed on that day will be refused.

Decreed accordingly.