This is a will contest. Joe P. Bryan died at Ogden, Utah, August 15, 1929, without wife or issue and leaving an estate of cash in the bank of approximately $8,000. A will made by him August 6, 1929, wherein Father P.F. Kennedy, pastor of St. Joseph's Church at Ogden, was named as executor, and St. Joseph's School of Ogden as the sole beneficiary, was admitted to probate December 4, 1929. Father Kennedy qualified as executor. Thereafter Bertha M. Clinch filed her petition in the cause praying that the order admitting the will to probate and the letters testamentary be revoked and set aside. The petition alleges that Bertha M. Clinch is the full sister of the deceased, his sole surviving heir and next of kin; that the instrument claimed to be the will was not duly executed as required by law; that the decedent at the time of the execution of the instrument was not, by reason of suffering from a malignant disease, and the result *Page 393 
of a major operation, in mental condition to comprehend what he was doing nor have sufficient will power to put in execution his own desires and purposes in regard to the disposition of his property; that he was not on August 6, 1929, of sound and disposing mind and memory, but of unsound and faulty memory; that, while decedent was still weak from loss of blood and tissue and the effects of anaesthetic and shock to his system, and while he lay in a dying condition and "not able to fully and intelligently bring himself back to this material world, not competent to grasp what he was doing, nor with sufficient will power to decide for himself," and while so weakened in body and mind and reasoning faculties that he was easily influenced, he signed the instrument; that it was not his free and voluntary act, and in signing the same was not following the dictates of his own will, which would naturally have led him to devise and bequeath his estate to his heir and next of kin, the contestant, who had mothered and cared for him as a child, and between whom "there had always existed genuine love and affection"; that Father Kennedy, the pastor of St. Joseph's Church, having under his supervision St. Joseph's School at Ogden, learned of the condition of Bryan, and that he was the owner of the property not disposed of, and, knowing that he had been baptized a Roman Catholic, had not attended any Catholic church or partaken of any sacrament of any church for nine years, and knowing that, because of his religious faith, he would be susceptible to any suggestion of Father Kennedy, who was then and there acting as father confessor of Bryan, he (Father Kennedy) "then and there substituted his own will for that of said Bryan, and then and there did by duress, menace, fraud and undue influence procure and obtain an ostensible assent from the said Bryan to the effect that he, the said Rev. Father P.F. Kennedy, should draw and cause to be drawn a will leaving all the property of the said Bryan to said St. Joseph's school," and, had it not been for such duress, menace, fraud, and undue influence so exercised on him, he would have died intestate, *Page 394 
or, if left free to exercise his own will, would have remembered his obligations which he owed to contestant and left his property to her. An answer was filed by the executor denying the allegations of undue execution of the will, of incompetency of the testator, and the exercise of any duress, menace, fraud, or undue influence, and alleging facts of due and lawful execution of the will, the mental competency of the testator, and that the will was made and executed as the free and voluntary act of Bryan.
A trial was had before a court and jury. After contestant had introduced evidence and rested, the executor moved for a judgment of nonsuit which was granted by the court and a judgment of dismissal of the contest made and entered. The contestant appeals and assigns as error: (1) the granting of the motion for nonsuit; (2) that the grounds of the motion for nonsuit were not precisely or specifically stated; and (3) the admission of certain testimony on cross-examination as not proper cross-examination.
Because of the nature of the case, we summarize the evidence rather fully as follows: Mr. R.J. Douglas, called by the contestant on direct examination, testified in substance that he was an attorney at law residing at Ogden, Utah; that he went to the Dee Memorial Hospital in that city on the evening of August 6, 1929, in response to a telephone call received at his home; that he met Father Kennedy at the entrance of the hospital, where the following conversation took place: Kennedy said: "Hello, you got my message?" The witness: "I did." Kennedy: "There is a man in the hospital who is sick and wishes to make some disposition of his property." Douglas: "I anticipated as much, having been called to the hospital many times and I have brought with me, pen, ink and paper." Douglas testified he had never met Bryan before, but was introduced to him on this occasion by Kennedy. Bryan was in bed in a room in the hospital, and there were present Bryan, Kennedy, Mrs. Hunt, a nurse, and the witness; that, after he had been in the room *Page 395 
about half an hour, he prepared a paper, the purported will, which was in his own handwriting except the signatures, and was written on paper brought from his home. On cross-examination he testified, without objection, assigned as error, except as noted, that he was not a Roman Catholic but a thirty-second degree Mason; that, prior to meeting Father Kennedy at the hospital entrance, they had never had any conversation respecting Bryan nor any other conversation than that related until they entered the room of Bryan; that in the hall outside of the door of Bryan's room they met Dr. Draper, the surgeon who had operated on Bryan, who said to them: "This man wishes to make some disposition of his property. He wants to give it to the St. Joseph's school, on Lincoln Avenue and Twenty-seventh or Twenty-eighth Street. He has told me that is what he wants to do." The witness said: "I am here for that purpose. Is the man very sick?" Doctor: "Yes, he is a sick man." Douglas: "Well, is he too sick to make a will, or make disposition of his property?" Doctor: "No, he is not. It is perfectly all right for him to make out any papers necessary." Upon going into the room, Father Kennedy said, "Joe, how do you feel?" To the question, "What did he say?" Objection was made that it was not proper cross-examination. The objection was overruled and the ruling assigned as error. The witness then related what was said by Bryan to the effect that he felt fine except for rheumatism in his right arm, that he had no pain in the abdomen. In answer to a question by the witness, Bryan said he wanted to make a will. Objection was made to any testimony of any further conversation on the ground that it was not proper cross-examination. The objection was overruled and is assigned as error. The witness then detailed the conversation with Bryan as to his age, name, where he lived, what relatives he had, and what disposition he wished to make of his property; that the testator said: "I have a sister who lives in Nebraska, but it doesn't make any difference what her name is, because I don't intend leaving her any of my property. *Page 396 
I don't want her notified I am sick. If I should die I don't want her notified of my death"; that all his bills were paid except doctor's and nurse's bills and hospital expenses. As to his property, he said: "I want to give my property to the little St. Joseph's School, on Lincoln Avenue. That little Catholic school down there, — do you know where it is? I want them to have everything I have got"; that Father Kennedy was present during the conversation, but took no part except when Mr. Douglas asked him whether or not the school was incorporated. Kennedy answered that all property was held by the Catholic bishop of Salt Lake who held such property in trust for the Catholic people of the diocese. The testator stated he did not want his property to go to St. Joseph's Church but to the little school; that he wanted Father Kennedy to act as executor and take care of his affairs; that after the will was prepared it was read to Bryan, who said, "that is just exactly what I want. That is the way I want my property to go. That is fine"; that Dr. Daines, an interne, and Mrs. Hunt, a nurse, were called in to witness the execution of the will. It was again read to the testator in the presence of the witnesses. Bryan declared it was his last will and signed the document and requested the witnesses to sign as witnesses, which they did. Bryan was awake and conscious the entire time and engaged in conversation with Father Kennedy regarding conditions in Ireland while the attorney was writing the will.
Father Kennedy testified on direct examination that he was pastor of the St. Joseph's Church and manager of the St. Joseph's School for Boys; that his duties with respect to the school were about the same as a principal except that he did not teach; that he was directly responsible under the bishop for the disbursements of the school, and visited it about once a week; that he was not directly concerned in raising funds for the school; that that was taken care of by the patrons whose children attended; that he had met Bryan for the first time on August 6, 1929, at about 4 o'clock in the afternoon; that he was asked to call on Bryan by Mr. *Page 397 
Timothy Ryan at the request of Mr. Jim Riley, vice president of the National Bank of Commerce; that on his first visit he received a passbook on the bank from Mr. Bryan; that on his first visit he was accompanied by Mr. Ryan; that he returned about 6:45 or 7 o'clock the same evening and again returned to Bryan's room about 7:30 with Mr. Douglas, he having sent for Douglas, but had not sent for him for the purpose of drawing a will; that he did not on that date administer any of the rites of the church to Bryan. On cross-examination without objection, except as indicated, he testified that prior to the time the will was made he made no inquiry as to whether Bryan had property and did not inquire whether or not he was a member of the Catholic Church; that on his first visit Bryan told him the bank passbook was in the hospital office and requested him to get it. He was then asked, "Will you state just what he said to you." This was objected to as not proper cross-examination, as selfserving. The court permitted an answer. Exception was taken and error is assigned. Exception was taken to the entire conversation thereafter related by the witness. This conversation was to the effect that Bryan asked Kennedy to take care of his affairs, pay his hospital expenses and doctor's bills. He signed a withdrawal slip for $500 and turned over the bank passbook. There was talk about the man's condition and health. Father Kennedy said, "I expect it is a long time since you were in church," and Bryan answered, "Yes, about nine years." Kennedy then told him he would be back tomorrow morning. That evening Kennedy again called about 6:45 and said: "Joe, have you fixed your affairs?" He said, "No, and I wish I had." Kennedy: "Would you like to see an attorney?" Bryan: "Yes, I wish you would send me an attorney." This conversation was introduced by the witness saying Jim Riley had sent him word that Bryan wanted to have his affairs fixed. This last conversation was admitted over the objection that it was not proper cross-examination. The witness then sent for Douglas. He said the conversation and transactions related *Page 398 
by Douglas were stated substantially correct. Father Kennedy called on Bryan the morning following the making of the will and administered the sacraments or rites of the church ordinarily given to one in good health and to the dying. The next witness was Bertha M. Clinch, who testified by deposition that she was the sister of Joe P. Bryan; that she and Joe were born in Ireland; that their mother died when Joe was born and the witness was eleven years of age; that both parents and all brothers and sisters are now dead. The witness came to this country and lived at various places before going to Nebraska, where she married and lived on a farm; that her brother Joe came to live with her in March of 1894 and left in July or August of the same year following a dispute with her husband. The dispute was over a team of horses Joe was driving running away, injuring one of the horses; that Bryan immediately came to the house, packed his belongings and left; that, although she knew of the dispute and that her brother was leaving, she had no conversation with him; that he went to the home of a brother of her husband living in the neighborhood, where he remained three weeks and then visited with some aunts at Sioux City, Iowa. From the time of his leaving she heard nothing from him and knew nothing of his whereabouts, except what the aunts told her, until she received the telegram from Father Kennedy advising of Bryan's death; that all that time she did not know where Bryan was, but "thought he was not living." On receipt of the telegram, her son left and went to Ogden.
Marie Bertoldi testified: That she operated the Denver Hotel. That Bryan, during the nine years previous to his death, stayed at her place four or five months in the winter of each year, at other times he was out working, she did not know where. That he left her place in March of 1929 and returned in June, saying he was a little sick. He lived at the hotel until he went to the hospital in August. He looked sick, but got up every day. That at his request she took him in her car to the hospital on August 4th. She said he never *Page 399 
talked much with her. Before going to the hospital, she said to him: "`What you do with your money you got, Joe?' I say, `What you going to do? Got any relation?'" He answered: "Oh, yes, I got some back East." That is all he said. "He say he no feel good, and he going to get operation and feel better." That, when he entered the hospital, he gave her name as friend and paid his bill for a week. That he left his belongings with her in a suitcase. That she visited him the second day after the operation and talked with him and he said "he felt better now," said he had seen Father Kennedy and liked him and was going to confession and communion.
Eli Holton, in charge of the office of the Dee Memorial Hospital, identified Bryan's chart containing the admission sheet and clinical record of the case which was introduced in evidence. It showed in pencil writing of Miss Child, a clerk, the word "relative" scratched out and the words "Friend: Mrs. Mary Bartoldi," written in the blank. Lower down under the printed word "Remarks" was written in ink, "Sister Mrs. Bertha Clinch, Emerick, Madison Co. Neb.," which was in Dr. Draper's handwriting.
Dr. L.R. Jenkins testified: He was a physician and surgeon and assisted Dr. Draper in performing the operation on Bryan. That the operation lasted two hours thirty-five minutes. That a general and a local anesthetic were used. They found a cancer at the end of the stomach which measured from the head of the pancreas and removed about two-thirds of the stomach, and about two inches of the small bowel directly connected with the stomach; said he saw the patient several times after the operation. That, while he was extremely sick, he was not as sick as the average patient after the average operation; did not complain of pain, took it calmly, was not emotionally unstable. That he was more co-operative and less disturbed by the operation than most patients are. The general anaesthetic was Ethylene gas, and novocaine was the local. That with the use of Ethylene *Page 400 
gas the patient comes out with less shock and does not remain under the effects nearly as long as when ether or chloroform are used. That patients' faculties are generally restored in a few minutes so they are able to talk before leaving the operating room and remember what they say. That he saw Bryan the morning after the operation. He was apparently in possession of his faculties, was friendly, said "Hello." That he talked and joked with Bryan, who responded as though he was not greatly disturbed, and said he was not in much pain. That in his opinion Bryan was in complete possession of his faculties, and not then under the influence of the anaesthetic. That he presented the same personality as when he came to the hospital. That he did not exhibit the least sign of disturbance or symptoms of toxinitis. That the patient was reticent, slow in expression, somewhat phlegmatic, not overemotional, but rather stoical, a fine type of stoic. That a hypodermic of morphine sulphate grains sixth was ordered every four hours to relieve pain and aid in prevention of peritonitis. That this dosage would not rob an ordinary man of his faculties, and, so far as he observed, it had no effect on the mental faculties of the patient. Ethel Holt, the supervisor at the hospital, testified she visited Bryan after the operation; that "his condition was poor, bad," and he finally died on the 15th of August; that she saw him the night of the day of the operation and he was conscious, talked and answered intelligently, but she did not remember what he said; saw him again the second night, and he answered and talked intelligently; that his condition required the attention of a nurse day and night. Annette Moore, a student nurse at the hospital, testified she saw Bryan the night he came in; that he looked thin and worn-out. She prepared him for bed that night and fixed him the next morning for the operation; saw him the evening after the operation; that he looked pale, "He looked ill, as they all do." She saw Father Kennedy go to his room, but did not remember whether more than once. She saw the patient each evening, conversed *Page 401 
with him, asked him how he was, but did not remember what he said, but he answered intelligently, and appeared to "have charge of his mental faculties."
Assignments of error numbered 3 to 10, inclusive, are directed to rulings of the trial court in overruling the objections to certain of the testimony of the witnesses Kennedy and Douglas on the grounds that it was not proper cross-examination. In the statement of facts we have indicated the questions objected to. The reasons urged by appellant for such objections are that Douglas and Kennedy were naturally friendly to proponent's contentions, and that, while contestant was under the necessity of calling them to show that the attorney was requested to go to the hospital by Father Kennedy, and that the attorney drew the will in the presence of Kennedy, the direct examination was restricted to such matters alone, and that the court permitted a too wide range of cross-examination and permitted the proponent to go into unrelated matters which were matters constituting the substantive defense. In support of of this contention, contestant cites 3 Jones on Evidence, § 820, and the case of Bishop v.Averill, 17 Wn. 209, 49 P. 237, 239, 50 P. 1024. It is not contended that the testimony objected to would not have been admissible if offered in defense, but merely that the questions were not proper cross-examination, and the subject-matter elicited should have been developed as a part of defendant's case. The rule stated in Bishop v. Averill, supra, is as follows:
"The general rule is that the cross-examination must be limited to matters disclosed upon the examination in chief; still when in such examination a general subject is unfolded, the cross-examination may develop and explore the various phases of that subject."
In that case, however, a strict limitation was applied because the witness was a party to the action, hostile to the side calling him, and the testimony sought to be adduced was peculiarly subject-matter of the defense. The case was not a will contest. *Page 402 
The extent of cross-examination rests very largely in the sound discretion of the trial court. Reviewing courts will be very careful and hesitate long before reversing judgments on the ground that the trial court either restricted or enlarged the scope of cross-examination. Anderson v. 1-4Salt Lake Ogden Ry. Co., 35 Utah 509, 101 P. 579;Whipple v. Preece, 24 Utah 364, 67 P. 1072. The rulings of the trial court will not be disturbed except for abuse of discretion, and such abuse cannot be predicated on a ruling from which no injury is shown to have resulted. 40 Cyc. 2513. We think all the evidence objected to was properly elicited on cross-examination, but, even if this were not so, yet the evidence was relevant and material, and could have been adduced in defense. The contestant suffered no injury by the introduction of such testimony even if adduced out of its proper order. The rule of cross-examination has been stated several times by this court and the decisions have been on the side of liberality rather than a strict limitation of the right of cross-examination. In Fissure MiningCo. v. Old Susan Mining Co., 22 Utah 438, 63 P. 587, 588, the court said:
"A party has a right upon cross-examination to draw out anything which would tend to contradict, weaken, modify, or explain the evidence given by the witness on his direct examination, or any inference that may result from it tending in any degree to support the opposite side of the case."
The case of Cahoon v. West, 20 Utah 73, 57 P. 715, was reversed on the ground that the trial court limited too strictly the scope of cross-examination where the witness was the principal actor whose good faith was involved, and that a wide range should be permitted on cross-examination. The court quoted with approval Rice on Evidence as follows:
"Mr. Rice, in his work on Evidence (volume 1, p. 585), says: `On cross-examination, counsel should be allowed a free range within the subject matter of the direct examination, and wide latitude should be given to a party who has to prove a negative, or to one examining a witness who was a participant in an alleged fraud.' And again, on *Page 403 
page 586, the author says: `The cross-examination of a witness cannot be confined strictly to the precise subjects called to his attention upon his direct examination, but should be allowed to extend to any matter, not foreign to the subject-matter of such examination, tending to limit, explain, or modify.'"
In the instant case the burden of proof was on contestant to show mental incapacity and undue influence, and the proponent of the will could meet this by proof of a negative, that is, that he did not procure the execution of the will by undue influence, and that the testator was not mentally 5-7 incapable. The contestant attempted to prove her case by certain facts which, standing alone, she insists would raise a presumption or create an inference of undue influence exercised by Father Kennedy. These facts are that Father Kennedy, a priest of the Catholic Church and manager of the beneficiary school, visited the testator at the hospital the day after a serious major operation, and that he called Mr. Douglas, who prepared the will. The testimony admitted on cross-examination over objection showed that respondent visited the hospital at the request of an officer of the bank where testator had his money on deposit; that the attorney was called by Kennedy at the request of the testator after Kennedy had been informed by the bank officer that Bryan desired to make arrangements of his affairs, the manner and substance of the conversation which testator had with the attorney prior to the making of the will, including his instructions as to how he wanted to dispose of his property, that he did not wish his sister mentioned in the will, that respondent did not suggest to the testator anything with respect to the disposition of the property. Such matters elicited on cross-examination were pertinent to, grew out of, were connected with, and had a direct bearing on, the subject-matter of the direct examination, tended to explain or modify the direct examination, and to meet and dispel any inference of undue influence which might arise from the bare facts developed on direct examination. The rule permits great latitude on cross-examination *Page 404 
when the defense is not something consisting entirely of new material, but is a denial of the allegations made by the contestant and where by cross-examination the proponent seeks to disprove the very case the witness has made for the party calling him. Jackson v. Feather River Gibsonville Water Co.,14 Cal. 18; Thornton v. Hook, 36 Cal. 223; New York Iron Mine
v. First National Bank of Negaunee, 39 Mich. 644. It cannot be said that the witnesses were hostile, prejudiced, or biased, or that their testimony was improbable. There is not anything in the record to show hostility. True, Father Kennedy had an interest as executor, and was indirectly interested because of his connection with the beneficiary, but that is not such an interest as necessarily to make him hostile where no such attitude is apparent from the testimony. Douglas had no interest whatever in the outcome of the case. He performed his services, and was paid therefor. The record does not disclose anything from which it might be inferred that he was anything but fair and impartial in his conduct or testimony.
Only a part of the circumstances connected with the making of the will was revealed by the direct examination. The subject-matter having been opened by the contestant, the proponent by cross-examination had the right to show the entire transaction. The rule against permitting one 8 to prove independent matters is not applicable because the matters developed on cross-examination, while relevant and material to the defense, were facts and circumstances related to and connected with the subject-matter of the direct examination. While the trial court permitted considerable latitude in the cross-examination, we think the subject-matter such that this was permissible and there was no abuse of discretion in that respect by the trial court.
When contestant rested at the close of her evidence, proponent moved for a nonsuit and dismissal. Error is assigned that this motion did not indicate precisely and specifically *Page 405 
the grounds on which the movant relied as required by the following decisions of this court: Frank v. Mining 9, 10Co., 19 Utah 35, 56 P. 419; McIntyre v. Mining Co.,20 Utah 323, 60 P. 552; Lewis v. Mining Co., 22 Utah 51, 61 P. 860;White v. Railroad Co., 22 Utah 138, 61 P. 568; Skeen v. RailroadCo., 22 Utah 413, 62 P. 1020; Gesas v. Railroad Co., 33 Utah 156,93 P. 274, 13 L.R.A. (N.S.) 1074, and Smalley v. Railroad Co.,34 Utah 423, 98 P. 311, 317. The rule deducible from these cases is that in a motion for nonsuit or for a directed verdict, or in the ruling of the court on such motion, there must be stated a sufficient specification of grounds to indicate the questions of law that takes the case from the jury. In Smalley v. RailroadCo., supra, the court explained and amplified the rule in the following language:
"If the grounds are sufficiently specified to call attention to the particular defects and the question of law on which the case is taken from the jury, that is all that is required. A mere general statement that, under the evidence, the plaintiff is not entitled to recover, or that the defendant is entitled to a verdict, or that the plaintiff has not made a sufficient case to go to the jury, does not point to anything. If, however, in a case of negligence a specification is made that the evidence is insufficient to show negligence on the part of the defendant, or that under the evidence the plaintiff is conclusively shown to be guilty of contributory negligence, or that he assumed the risk, etc., such a specification is ordinarily sufficient. If a verdict is directed on the ground that the evidence is insufficient to show negligence on the part of the defendant, it sufficiently is made to appear on what question of law the case was taken from the jury. The making of such a specification ordinarily points out the defect within the meaning of the adjudicated cases."
The motion made is lengthy and need not be quoted in full. It contains five paragraphs and covers in similar manner all of the material allegations of the complaint. One of the paragraphs is sufficient to show that the motion met the requirements stated in the Smalley Case and pointed directly to the questions of law relied on to take the case from the jury. Paragraph 2 of the motion is as follows: "Upon the *Page 406 
ground and for the reason that the contestants have failed absolutely to put in any evidence to the effect that the testator, Joseph P. Bryan, was not at the time of the execution of said instrument competent to make a will, and that there has been no evidence of any kind or character introduced on behalf of the contestants to support any of the allegations of paragraph four of the protestant's or contestant's amended petition; on the contrary, that all of the evidence introduced on behalf of the contestants themselves is to the effect that the testator at the time of the making of the will was of sound and disposing mind, was competent to make a will, and had been so for a long period of time prior to the execution of the instrument introduced by the contestants, which is the last will and testament, admitted to probate by this court, of the testator, Joseph P. Bryan; and that the uncontradicted evidence in this case, introduced by the contestants, themselves, is unqualifiedly contradictory of every allegation contained in paragraph four; and that there is not a scintilla of evidence introduced in support of any of the allegations of paragraph four of the contestant's amended petition."
This part of the motion sufficiently, but with more verbosity than necessary, apprised the court and counsel that the executor claimed there was no evidence to support the allegation of incompetency of the testator at the time of the making of the will. The other paragraphs of the motion being similar in form and substance were also sufficient to call attention to the particular defects on which defendant relied.
The remaining assignment challenges the action of the trial court in granting the motion for nonsuit and dismissal. The allegation that the will was not executed with the formalities required by law was abandoned at the trial and it is not now before us. It is contended the evidence was 11, 12 sufficient to take the case to the jury on the issues of want of testamentary capacity and undue influence. It is not the contention that the testator was insane *Page 407 
or of unsound mind, but only that because of illness and his recent operation he was so weakened in body and mind as to be susceptible to the controlling influence of a priest of the Catholic church of which he was a member, and that the priest, Father Kennedy, exercised such a controlling influence on his mind that he bequeathed all his property to the school over which Father Kennedy presided, to the total exclusion of his sister, "the natural object of his bounty"; that for purposes of passing on the motion it was not necessary for the contestant to establish by a preponderance of the evidence that Father Kennedy was instrumental in procuring the will, but, if the evidence warranted the inference that he did so, and showed the confidential relationship of priest and penitent, then the law raised the presumption of undue influence, and it was for the jury to determine whether or not the presumption so created was rebutted or overcome. It will be noted that the will had already been duly admitted to probate before the contest was filed, so that the burden of proof rested on contestant to establish the grounds of the contest. 28 R.C.L. 398; In re Hanson's Will,50 Utah 207, 167 P. 256. The rule contended for by contestant and claimed to be supported by the cases cited by her is that the law presumes undue influence "where a patient makes a will in favor of his physician, a client in favor of his attorney, a ward in favor of his guardian, a person in favor of his priest or religious adviser," particularly where the beneficiary was active in the preparation of the will. Thompson on Wills, § 86, p. 80; Drake's Appeal, 45 Conn. 9; McQueen v. Wilson, 131 Ala. 606,31 So. 94; Hegney v. Head, 126 Mo. 619, 29 S.W. 587; In reWitt's Estate, 198 Cal. 407, 245 P. 197; Marx v. McGlynn,88 N.Y. 358; In re Hartlerode's Will, 183 Mich. 51, 148 N.W. 774. Contestant also urges that when her evidence, considered in the aspect most favorable to her, is sufficient unexplained to support a verdict (In re Hartlerode's Will, supra), or if there is any evidence on the issue of undue influence, the question is for the jury (Walls v. Walls, 99 S.W. 969, 30 Ky. *Page 408 
Law Rep., 948, and Blackman v. Edsall, 17 Colo. App. 429,68 P. 790).
In Miller v. Livingstone, 31 Utah 415, 88 P. 338, 342, this court had occasion to discuss the rule with respect to presumption of undue influence and burden of proof where a will was drawn at the request and under the direction of the sole beneficiary, such beneficiary being the second wife, and the children by a former wife being excluded from participation in the estate. Mr. Justice STRAUP, speaking for the court, said:
"At the outset it is well to observe that the will was drawn at the request and direction of the sole beneficiary, who was active in procuring and superintending its execution. There are cases holding that, under such circumstances, a presumption of undue influence arises sufficient to cast the burden of proof upon the proponent to show that the will was voluntarily executed. Other authorities hold that the burden is not shifted but that it merely raises a suspicion which ought to appeal to the vigilance of the court; that such wills are not looked upon with favor; and that the court will cautiously and carefully examine into the circumstances which were attendant upon their execution, and will scan with a scrutinizing eye the evidence offered to procure their probate; and such circumstances may, in some instanes, be sufficient to exclude the proposed will, unless the suspicion is removed and the court is judicially satisfied that the paper propounded does, in fact, express the true will of the deceased. Underhill on Wills, § 137; Delafield v. Parish,25 N.Y. 9. We agree with the author above cited and with the authorities holding that the latter is the safer and the better rule."
In 1 Underhill on the Law of Wills, p. 210, the author announces a similar rule with respect to the alleged undue influence of a pastor or other religious officer which is applicable to the facts in this case, and is in harmony with the rule announced in the Miller Case, as follows:
"As in other cases where a confidential relation exists between the testator and the principal legatee, the fact that the will disposes of the bulk of the property of the testator in favor of his religious adviser is not enough alone to raise a presumption that it was procured by undue influence. *Page 409 
"But the presence of a priest at the bedside of the testator, the fact that the latter acted upon his suggestions and accepted his advice, and that the will is largely the result of these suggestions and advice, are always material. On the other hand, it is entirely consistent with freedom of will that the testator, though he have a family, shall give largely of his property to religious enterprises. Where the suggestions of advice of the priest result, not in a personal benefit to himself, but in securing a benefit to the particular church or form of religion of which he and the testator are adherents, no question of undue influence on the part of the priest arises; for whatever influence was exerted was not exerted for his own benefit. If, upon the suggestion or importunity of his spiritual adviser, the testator leaves him a large share of his estate, to the exclusion of his immediate family, a suggestion of undue influence may arise; but even then it is only suspicion, to be considered in connection with relations with his family, his physical and mental weakness, and the extent to which he has been under the influence of the priest."
1 Schouler on Wills, Executors and Administrators, is to the same effect:
"In general, the existence of a confidential relation, as between guardian and ward, attorney and client, physician and patient, or even religious adviser and layman, is of a nature which implies peculiar opportunities outside the family relation, for influencing duly or unduly the making of a will contrary to the natural disposition of blood or marriage. Such opportunities must not be abused; and whenever a will appears to have been procured through the zealous intervention of one occupying this favored position, to his own especial advantage, and to the prejudice of natural objects of one's bounty, and especially where the relation is of external origin as respects the testator's family, fraud and undue influence will readily be inferred, unless all jealous suspicion is put to rest by the evidence adduced to sustain it. At the same time such an unfavorable suspicion amounts to nothing more than a presumption of fact, and may always be overcome by proof that a testator of suitable intelligence made his will as he saw fit."
This court is committed to the doctrine that, when facts and circumstances are shown concerning which a presumption arises or is indulged, the presumption ceases, and the case is to be decided on the evidence introduced independently of the presumption; that is, that the presumption is not 13-15 evidence and has no weight as *Page 410 
evidence. In re Newell's Estate, 78 Utah 463, 5 P.2d 230, andState v. Green, 78 Utah 580, 6 P.2d 177. If there is evidence that the beneficiary of the will was in confidential relationship with the testator, and was active in the preparation of the will, there arises from proof of such acts and relationship a suspicion which amounts to a presumption of fact, but which may nevertheless be overcome by evidence that the will was the free act of the testator. The presumption, however, disappears, and is not to be weighed against evidence when additional facts are adduced which show the circumstances and conditions under which the will was made. The case then must be decided on the facts. If the evidence is undisputed, and if but one conclusion or inference is properly and reasonably deducible therefrom, it is for the court and not for the jury.
It will be remembered that Father Kennedy had not been in confidential relationship with the testator, but had met him for the first time the day the will was executed, that he called on the testator, not as a volunteer, but because he had been invited to the bedside for the very purpose of 16, 17 taking care of the testator's affairs, as well as to administer to him the rites of the church for the sick and dying. Prior to the making of the will, there had never been between them any confidence in the nature of confession or administration of sacraments. Father Kennedy was not a beneficiary of the will.Adams v. First Methodist Episcopal Church, 251 Ill. 268,96 N.E. 253. He did not assert any influence by way of suggestion or otherwise such as to amount to or raise a suspicion of undue influence. The most that can be said is that during the few minutes he was alone with the testator he, notwithstanding his testimony to the contrary, may have suggested a disposition of the testator's property to the school over which he presided. Undue influence must be proved. It will not be presumed from mere interest or opportunity. The opportunity to exercise influence, unless combined with circumstances tending to show its exercise, affords no presumption *Page 411 
that it was in fact exercised. 40 Cyc. 1151; 1 Page on Wills (2d Ed.) 1226; In re Clark's Estate, 5 Misc. 68, 25 N.Y.S. 712;Severance v. Severance, 90 Mich. 417, 52 N.W. 292; Fischer
v. Sperl (In re Sperl's Estate), 94 Minn. 421, 103 N.W. 502;In re Black's Estate, 132 Cal. 392, 64 P. 695.
Bryan, if of sound and disposing mind and memory, had a right to dispose of his property as he saw fit. He could disinherit his sister if he wished. The will cannot be set aside on the mere suspicion that the priest called to his bedside suggested to him a certain disposition of his property. 18, 19 To vitiate the will, there must be more than mere influence or snuggestion; it must be undue influence. However exhibited, it must be such influence as to destroy the free agency of the testator and impel him to do what he would not have done had he been free from the control of such influence. The kind of influence which will avoid a will has been referred to by this court in Anderson v. Anderson, 43 Utah 26, 134 P. 553,557, as follows:
"Undue influence may be established without showing any physical coercion or constraint. The influence that vitiates may be subtle and be entirely without outward demonstration, but in whatever form it may appear it must, nevertheless, be made to appear from competent evidence that the will of the one accused of practicing undue influence dominated the will of the testator — that the testament is in fact and effect the will of the accused and not that of the testator."
The rule is stated in 40 Cyc. 1144, as follows:
"Mere general or reasonable influence over a testator is not sufficient to invalidate a will; to have that effect the influence must be `undue'. The rule as to what constitutes `undue influence' has been variously stated, but the substance of the different statements is that, to be sufficient to avoid a will, the influence exerted must be of a kind that so overpowers and subjugates the mind of the testator as to destroy his free agency and make him express the will of another, rather than his own. The mere existence of undue influence, or an opportunity to exercise it, is not sufficient; such influence must be actually exerted on the mind of the testator in regard to the execution of the will in question, either at the time of the execution of the will, or so near thereto as to be still operative, with the object of procuring a will in favor of particular parties, and it must result in the *Page 412 
making of testamentary dispositions which the testator would not otherwise have made. No precise quantity of influence can be said to be necessary and sufficient in all cases, as the amount necessarily varies with the circumstances of each case, and especially does it vary accordingly as the strength or weakness of mind of each testator varies, the amount of influence necessary to dominate a mind impaired by age, disease, or dissipation being obviously less than that required to control a strong mind."
And further with respect to one occupying a confidential relation:
"The influence over a testator of one who is his wife, child, guardian, attorney, spiritual adviser, or who occupies some other confidential relation to him, is not necessarily undue influence, although it may, when coupled with other circumstances, raise a presumption of undue influence; but the question must be determined, as in all other cases, by ascertaining whether the free agency of the testator has been destroyed."
That Bryan was at the time of the making of the will of sound mind we have no doubt. From Mrs. Bertoldi's testimony we gather he was a man of strong mentality and few words, a man who usually knew what he wanted, and did it without much ado. At the time he went to the hospital he was thin and worn from disease, but his mental powers were unimpaired. Dr. Jenkins described his condition after the operation and said he was not as sick as the average patient, "did not complain of pain, took it calmly, was not emotionally unstable," was "more cooperative and less disturbed by the operation than most patients are, a fine type of stoic"; that on the day after the operation he had full possession of his faculties, was not greatly disturbed, and was unaffected by the small doses of morphine given him; that he presented the same personality as when he came into the hospital. The nurses testified they talked with him after the operation; that he talked and answered intelligently. Mr. Douglas is a lawyer of repute and many years' experience. Not anything is made to appear that would indicate he was hostile, prejudiced, or biased. His testimony is unimpeached. He testified he talked with Bryan for half an *Page 413 
hour before drawing the will, and after it was drawn he read it to the sick man, holding the will in front of him so that he was able to follow the reading with his eyes; that the will was read a second time to him in the presence of the subscribing witnesses, one of whom was a nurse, and the other the interne at the hospital. The manner and substance of the conversation, the circumstances of the drawing and executing of the will, strongly show that Bryan was acting of his own free will without suggestion or coercion of any kind. He was emphatic that he wanted his estate to go to the St. Joseph's School, not the St. Joseph's Church, and that he did not want his sister's name mentioned in the will because she was not to receive anything from the estate. It cannot be said that his sister, the contestant, would be the "natural object of his bounty" or that the will was unnatural or unreasonable. Bryan had no one dependent on him, and was under no obligations to any one. The contestant testified that she had not seen her brother or heard from him for approximately thirty-five years, did not know where he was, and had thought "he was not living"; that in 1894 he lived in her house in Nebraska from March until July, when he left because of a dispute with her husband; that he remained a few weeks with a brother of Mrs. Clinch's husband, and then visited some aunts in Sioux City, after which she never heard of him again until she received the telegram from Father Kennedy advising her of his death. Although Bryan knew his sister's address, he never communicated with her. It is apparent there was little or no affection between them. In view of all these circumstances, it is not at all surprising that he should make a will excluding her from participation in the estate. His declarations as testified to when asked his sister's name, that it did not make any difference as he did not intend to leave her any property, and did not want her advised of his illness or notified of his death if he should die, were entirely consistent with his conduct with reference to his sister during the previous thirty-five years. Appellant argues that, because the name of Bertha M. Clinch *Page 414 
appeared on the hospital record, the natural presumption is that he wanted her to succeed to his estate, and that such presumption is strengthened because when Mrs. Bertoldi, his close friend, asked what he was going to do with his money, he answered he had relatives back East. The record, however, does not support any such presumption or inference. When Bryan came to the hospital, he was asked the name of his relatives, and, instead of giving Mrs. Clinch's name, he gave that of Mrs. Bertoldi as a friend. The hospital record shows the printed word "relative" stricken and the word "friend" written above, followed by Mrs. Bertoldi's name and address. Some time later Dr. Draper learned the name and address of Mrs. Clinch, and wrote it himself on the record. Mrs. Bertoldi, before taking Bryan to the hospital, asked him: "What you do with your money you got, Joe? What you going to do? Got any relation?" And he answered: "Oh, yes, I got some back East." That is all he said. He did not mention Mrs. Clinch nor indicate by what he said that he intended her to have his property.
There is not anything in Father Kennedy's conduct to show the exercise of undue influence. The father went to the hospital at the request of Mr. Riley, vice president of the bank where Bryan had money deposited. The record does not show how Riley came to call Kennedy, but the inference is it was at Bryan's request. At any rate, Kennedy did not go to the sick man as a volunteer, but because he was requested to do so. Father Kennedy called Mr. Douglas to the hospital also at Bryan's request. The first intimation of how Bryan would dispose of the property came from Dr. Draper, who told Douglas and Kennedy as they went to the sickroom that Bryan wanted to bequeath it to the St. Joseph's School. Prior to the will, Bryan had never confessed to Father Kennedy nor had administered to him the sacraments of the church, although such was done later. The relationship between the priest and the testator was not such as to raise the presumption of undue influence or that the testator was acting under control of the superior *Page 415 
mentality of Father Kennedy or any one else. His conversation and declarations indicate he knew what he wanted to do with his property and that he disposed of it in the way which pleased and satisfied his own wishes. A case very similar to the present one, and which supports the conclusion we have reached, is that ofKerrigan v. Leonard (N.J. Prerog.) 8 A. 503. The headnote alone is sufficiently explanatory, and is as follows:
"A testatrix by her will gave her real property to a priest, in trust for the benefit of a Catholic church of which she was a member. The priest attended to a business of drawing and executing the will for her, through a lawyer, but it was at her request, she having sent for him to visit her for that purpose. No conversation took place between the testatrix and the priest as to the disposition to be made of her property at any time before that. After the will was drawn, it was read over to her carefully and slowly, by the lawyer, and she understood it. She named the priest as executor, and directed that it be handed to him for safe-keeping. The will was in accordance with her previous declarations as to the disposition which she intended to make of her property, and was executed with all due legal formalities. Held, that there was no evidence of undue influence, and that it was properly admitted to probate."
Another case of similar import is Martin v. Bowden,158 Mo. 379, 59 S.W. 227, 231. The testator was a widower with no children or direct descendants. The will was made three days before death, while testator was sick with tuberculosis. Several bequests were made to his relatives, some substantial, and others very small, but the bulk of his property went to the archbishop of the Catholic Church for masses for the repose of his soul. In sustaining the trial court in withdrawing the case from the jury, the Supreme Court said:
"Undue influence means such influence `as amounts to overpersuasion, coercion, or force, destroying the free agency and will power of the testator.' Tibbe v. Kamp,154 Mo., loc.cit. 579, 54 S.W. 879, 55 S.W. 440, and cases cited; Sehr
v. Lindemann, 153 Mo., loc.cit. 276, 54 S.W. 537, and cases cited; Schierbaum v. Schemme, 157 Mo. 1,57 S.W., loc.cit. 529 [80 Am.St.Rep. 604]. The undue influence charged in the petition is that of Rev. Patrick H. Bradley, assistant rector of *Page 416 
the Sacred Heart Church. The only testimony offered by the plaintiffs to support this charge was that of Rev. Bradley himself. So far from giving any countenance to the charge, the testimony of this witness emphatically denies the charge, and affirmatively shows that such was not the case. He never spoke to the testator until called to see him during his last sickness. The testator was not a member of the parish of which the witness was assistant pastor. On the second visit of the witness the testator wanted to give him $4,000, to be used by him for masses to be said for the repose of the souls of his father, mother, wife, and himself, but the witness refused to take the money. The testator then asked the witness whom he would suggest the money for this purpose should be given to, and the witness replied Archbishop Kain was the richest man in the church in St. Louis, and if the money was given to him he would see that it was used as the testator desired. Afterwards the testator told Rev. Bradley he had made a will, and told him its provisions, and in speaking of the provisions for his relatives said, `They have already gotten more than is coming to them from me.' Archbishop Kain was in Europe when the will was made, and is not shown to have known either of the will or of the testator."
There was not sufficient evidence adduced by the contestant to take the case to the jury or to support a verdict against the will had such a verdict been rendered. The trial court therefore committed no error in granting the motion for nonsuit.
The judgment of the district court of Weber county is hereby affirmed, with costs to respondent.
STRAUP, Chief Justice, and ELIAS HANSEN, EPHHAIM HANSON, and MOFFAT, JJ., concur