## In re GEORGE'S ESTATE
### GEORGE et al. v. GEORGE et al.

No. 6204.    Decided April 22, 1941.    (112 P. 2d 498.)
Rehearing Denied June 24, 1941.

*Hurd & Hurd,* of Salt Lake City, and *Cline, Wilson & Cline,* of Milford, for appellants.

*P. N. Anderson,* of Nephi, and *William H. Folland,* of Salt Lake City, for respondents.

PRATT, Justice.

In this case certain heirs of George A. George, deceased, who were excluded from benefits under his last will and testament, are protesting the admission of that will to probate, on three grounds, two of which were submitted to the jury: incapacity of George A. George to execute the will at the time it was executed; and undue influence exercised upon him by the son and daughter who were made the sole beneficiaries under the will. The protesting heirs include other sons and daughters of deceased. The case was tried to a jury, and a verdict was returned in favor of protestants; upon which verdict the court denied the petition for probate of the will, holding that instrument to be void. Propenents of the will, Weldow George, the petitioner, and

his sister Elizabeth, also known as Lizz, are the two appellants, and the sole beneficiaries under the will.

A will contest in this state is a law case. If there is substantial evidence to support the verdict, this court will not interfere. *In re Bryan's Estate,* 82 Utah 390, 25 P. 2d 602; *In re McCoy's Estate,* 91 Utah 212, 63 P. 2d 620; and *In re Goldsberry Estate,* 95 Utah 379, 81 P. 2d 1106, 1113, 117 A. L. R. 1444.

There was a full compliance with all legal formalities in the execution of the will. A firm of three lawyers was present, prepared, read, and supervised the execution of the will. Two doctors were present at the request of the attorneys, to ascertain the mental condition of the deceased. Two neighbors were called in as witnesses, and signed the will in that capacity. The court found that the will was properly executed.

The doctors had been called as a result of the service upon the deceased, the day of the execution of the will, January 4th, 1939, of process in a proceeding instituted by some of the contestants to have the deceased declared incompetent and a guardian appointed for his person and estate. The lawyers testified that they took precaution to ascertain whether or not deceased was competent to make a will, in view of the guardianship action taken by contestants.

The lower court submitted the issue of incapacity to the jury. We think this was error. The lawyers, the doctors, and the two subscribing witnesses to the will all agreed that deceased was competent at the time. They testified as to conversations with him; as to the fact that he recognized those present with whom he was acquainted; that he addressed them by their names; and that he properly answered questions asked as to his property and the will that was drawn. The only evidence which was probative value as proof of incapacity is the following: the age of deceased, 84 years; his weakened physical condition necessitating the guiding of his hand in signing the will; his for-

getfulness; his suffering from pain at the time—he suffered from a hardening of the arteries and poor blood circulation in his legs, which pained him considerably; and evidence that he was inclined to cry when matters were not to his liking. This evidence, alone, however, though true it may be, is not inconsistent with testamentary capacity. At most it is simply evidence which along with other evidence might logically lead to an inference deceased did not possess testamentary capacity. Absent that other evidence, certainly this evidence is not sufficient of itself to offset positive evidence to the effect that deceased was possessed of testamentary capacity at the time he executed the will.

The error of submitting this issue to the jury was prejudicial, as it leaves the case in doubt as to whether or not the jury's verdict was based upon incapacity or upon other grounds; and if based upon incapacity, ■ it was without sufficient supporting evidence.

What is undue influence? In the case of In re Goldsberry Estate, cited above, we quote with approval this statement: ■

"In order to set aside a will for undue influence, there must be substantial proof of a pressure which overpowered the volition of the testator at the time the will was made."

*In re Bryan's Estate* [82 Utah 390, 25 P. 2d 610], cited above, we approved this statement taken from 40 Cyc. 1144:

"The mere existence of undue influence, or an opportunity to exercise it, is not sufficient; such influence must be actually exerted on the mind of the testator * * * either at the time of the execution of the will, or so near thereto as to be still operative, with the object of procuring a will in favor of particular parties, and it must result in the making of testamentary dispositions which the testator would not otherwise have made. * * *"

In the present case the will was executed January 4th, 1939. Neither Weldow George nor Elizabeth were present in the room at the time. The deceased had requested the presence of counsel, Mr. Wilson, one of the firm of attorneys.

Mr. Wilson brought his two partners. These counsel were instrumental in having the doctors present. Weldow had procured the presence of Wilson, and Weldow or some of his family procured the witnesses. No conversations took place between either Weldow or Elizabeth and counsel, or the witnesses, pertaining to the manner of distribution of the property. The deceased had in mind disposing of his property by conveyances. One of counsel suggested that a will would be better. Deceased adopted this idea. At the suggestion of counsel the following two paragraphs were included in the will:

"Fourth: I do hereby declare that heretofore and on the 17th day of December, 1935, I have made, executed and delivered to my daughter, Elizabeth George, a certain deed describing the following real estate situated in the County of Millard, State of Utah, to wit: All of Lot Two (2), Block Eighteen (18), Plat 'A,' Kanosh Town Survey, together with the water rights and appurtenances thereto, with all improvements thereunto belonging, and I do further declare that the said deed was delivered to her at that time with the full intention that the same convey to her a fee simple title. I do now declare and state that the water rights appurtenant to said premises was and is one and one quarter shares of the capital stock of the Corn Creek Irrigation Co.

"In the event, for any reason whatsoever, the transfer of the said real estate or water rights appurtenant thereto, should be declared invalid by any court of competent jurisdiction, then I do hereby give, devise and bequeath the said realty and water rights appurtenant thereto to my said daughter, Elizabeth George."

"Sixth: I do hereby declare that heretofore and on the 20th day of November, 1932, I have made, executed and delivered to my son, Weldow George, a certain deed describing certain real estate in Millard County, Utah, and which said deed was recorded in the office of the County Recorder of Millard County, Utah, on the 21st day of November, 1935, in Book 17 of Deeds, at page 442 thereof. I do further declare and state that the said grantee, Weldow George, has fully performed all of the terms and conditions set forth in the said deed to my entire satisfaction, and that the recordation of said deed was at my request and that it was my intention thereby that the title to said premises be vested absolutely and in fee simple in the said Weldow George.

"In the event, for any reason whatsoever, the transfer of the said real estate and all appurtenances thereto, should be declared invalid

by any court of competent jurisdiction, then I do hereby give, devise and bequeath the said realty and all appurtenances thereunto belonging to my said son, Weldow George."

These paragraphs speak for themselves as to what happened concerning the bulk of deceased's property. On the morning of January 4th, the day of the execution of the will, deceased was served with the guardianship papers. This had quite an upsetting effect upon him; and also caused quite a commotion by Weldow and Elizabeth. The latter cried and said her father had been arrested. The former swore about contestants and told the father that they were trying to make him (the father) out crazy and unable to look after his property. Weldow asked the father whom he desired as administrator. The father answered, Weldow George." This occurred in the presence of some other members of the family, and before the counsel and the doctors had arrived. The litigants disagree as to whether "administrator" was intended as "guardian" or in its true meaning. Counsel upon their arrival explained the significance of the guardianship matter to the deceased, who was very desirous of contesting it. Counsel, however, explained that there was no need for hurry in that matter; that they had come to the house for the purpose of fixing up the papers necessary to a disposition of deceased's property subsequent to death. They then proceeded to the drawing up, the discussion of, and the execution of the will.

The paragraphs excluding the heirs, other than Weldow and Elizabeth, read as follows:

"Eighth: I do hereby state and declare that I have given my said son, Weldow George, and my said daughter, Elizabeth George, the property heretofore conveyed them, and I do hereby further state and declare that the bequests herein made them, are for the reason that they have cared for and looked after me for many years last past and I therefore feel that they are justly entitled to any property which I have heretofore owned or now own.

"Ninth: I do hereby expressly exclude any and all heirs not herein specifically mentioned, and I do hereby state and declare that I have

not omitted or excluded any of such heirs by oversight or inadvertence."

We have set out deceased's physical condition at the time, in our discussion of his testamentary capacity. Thus we have the picture of events on January 4th, 1939.

In this picture we find but few facts probative of contestants' contention of undue influence. At the most they are these: deceased's weakened physical condition; Weldow and Elizabeth were the sole beneficiaries out of some nine or more heirs; Weldow was instrumental in getting counsel and witnesses present; and each made remarks at the time of service of the guardianship papers which might have inflamed the mind of deceased against his other heirs. It seems to us, however, a strained inference to infer from these remarks that they were a part of a scheme to influence the mind of deceased. It would seem that the outbursts were the result of an emotional strain, the tensity of which, and the exaggerations of which were measured by their lack of familiarity with legal proceedings.

The father had a perfect right to make his two children his sole beneficiaries if he so desired. Furthermore, the fact that one of the two beneficiaries was instrumental in getting the counsel and witnesses present does not in this case add weight to contestants' claims. Such an act is as consistent with innocent intentions as with ulterior motives. The same is true of the physical condition of deceased. It was a fertile field for undue influence, but not evidence of undue influence. We cannot see in the picture of the events of January 4th, 1939, anything to which the court might point as a prima facie case of undue influence. It is interesting to note that the bulk of deceased's property was deeded to these two children some years prior to the execution of the will. As to that property, it cannot be said that at the time of the execution of the will, he made a disposition of it which he would

not have made without having been unduly influenced. He had made those dispositions prior to January 4th, 1939 (see rule quoted from 40 Cyc. 1144 above).

The undue influence to vitiate the will must have affected deceased at the time he executed that instrument. This, however, does not mean that Weldow and Elizabeth must have been present actively engaged, that day, in subjecting their father to undue influence. Undue influence may be of a subtle kind, the result of previous acts which have so affected testator as to deprive him of his free agency on the day of the execution of the will. This brings us to the question of events prior to January 4th, 1939.

In 1924, deceased's wife, and mother of his children, died. Elizabeth, then a widow, moved into the ten-room home with her father. From then on until his death, she looked after the place for him, spent some of her money in improving it, milked the cows, and generally assumed the place formerly occupied by her mother. The other children visited with the father and took him out for rides; but it does not appear that they offered or performed any help about the home other than to aid him in illness. The burden of housekeeping duties fell on the shoulders of Elizabeth. Weldow and his father associated together more than did the father and the other sons.

The land referred to in the sixth paragraph of the will as having been conveyed to Weldow, was originally conveyed to another son, Lon George and a grandson, Preal George. Trouble over payments upon the land arose between these two and deceased, which trouble seems to be laid at the door of Weldow by his brother Lon and nephew Preal, and the land was taken back, then disposed of to Weldow, who made small payments upon it.

When the deed referred to in the fourth paragraph of the will was made to Elizabeth, it was delivered to Weldow to be held until the father's death before recording. Wel-

dow, however, recorded it in 1938, and Elizabeth made a deed to her father to be delivered to him by Weldow in case she died first. This deed Weldow destroyed after the father's death.

When each of his boys was married, deceased gave him a house. He expressed himself on occasions as desiring each of his children to share in his estate. On one occasion, when he became ill, he expressed the desire to live long enough to fix his property in a way that each would share therein.

On one occasion of illness, deceased requested that attorney Wilson be summoned. Weldow conveyed his desires to Mr. Wilson, but the latter did not come. Later Weldow met Mr. Wilson, and expressed indifference about his coming. As a result the attorney did not come to the deceased's place until January 4th, 1939, at which time he came as a result of Weldow's notifying him again.

When deceased became quite ill and could not leave the house, finally resulting in his being confined to bed, Weldow and his wife moved into the home place. When deceased was in need of physical care, such as messaging his leg when it pained, some member of the family present aided him. Often this was done by the children of Weldow. It became necessary eventually to look after deceased almost constantly, such as bathing him and tending to his daily neeeds. This was done by some member of the family living at the house. When deceased became too weak and blind to look after his accounts, Weldow's wife was given power to sign his checks and keep his accounts.

A joint savings account of some $500 was deposited in the bank in the name of deceased and the name of Weldow. Most of this money was spent by Weldow for his father's funeral. Some was spent for taxes.

Up and until sometime in December 1938 an open rift had not occurred between Elizabeth and Weldow on one side and their brothers and sisters on the other. How-

ever, about this time neither Weldow nor Elizabeth welcomed the others at the home, and took steps to see that the others were not alone with their father.

The following are some of the statements attributed to deceased:

### 1935—To daughter Mary Alice:

"Well, Mary Alice, it looks like I have got a pretty slim chance; I sure would like to live long enough to fix my property up, because I want every one of you to have some of the property, and Roy, I want him to have a piece of ground."

### 1934—Conversation between Weldow and father:

"Father, you are a pretty sick man; you want Lizz to have this home when you pass away, don't you?" The father said nothing for a few minutes, tears came to his eyes, and then he said: "I don't want you to take that little farm from Elmer's boys." (Not the home)

### 1934—To Mary Alice about key to his trunk containing $300:

"You know Weldow is a good boy but don't let him get into my trunk."

Weldow took the key from his father's purse. This worried the father for weeks. In learning of it he said:

"I was afraid of that."

### 1934—Testimony of Mary Alice about conversation about taxes:

"He wanted me to look at his tax papers; and Lizzie refused getting the papers for him and I insisted that she get the papers for father and so finally she got them. * * * I just got one paper opened and Lizz says, 'There comes Weldow.' Father says, 'Put them away, put them away,' and he insisted."

In November, 1938, Mary Alice told him he should have a doctor. He replied,

"I will tell you it isn't a thing in the world wrong with me but worry." "I have got my taxes to pay and I haven't got any money."

In 1926 when the contract to sell the "big farm" to Lon and Preal was made, deceased transferred 20 shares of irrigation company stock to Weldow, saying:

"I have had to do this because he has become so angry at me. He wanted the old farm, and the Lord knows he can't pay for it."

In March, 1938, a granddaughter, Athella Penney, asked him if he was doing pretty well shipping cream. He answered, "I never see my creamery check." The following June he started crying and said to her, "It seems like there is one or two of my children that wants everything I have got. They don't want to see me with nothing." After crying some more he added, "It seems like my other children can't come and see me like they used to."

In about July, 1938, W. E. Allen asked him if it were true that he was going to sell his home and farm in Kanosh. The old gentleman said,

"Well, I talked of it and I was going to, but Weldow told me not to and so I daren't."

Frank T. Slaughter, an old friend, was talking about conveying of the big farm to Weldow, observing: "I think taking it all in all and in consideration of the heirs and the other children that you have made a mistake." Deceased said, "I know that, I know it." In 1936 these old gentlemen were discussing the crediting of a debt owed by Weldow to his sister Vie against a mortgage Vie owed her father. The father admitted that he didn't like it, crowding the account of one of his children in favor of another, that it was not right and that he had made another mistake.

There are other statements of similar import which we will not include in our opinion.

To Weldow George are attributed statements such as the following:

In 1934 he was talking to his brother-in-law, Guy Bement, about the property. Weldow said,

"I have got something to worry about if the old man dies. I hope and pray that he gets on his feet again, and if he does, I am going to have things fixed out the way I want them." "That old man will do any g— d— thing I want him to do!"

To Elizabeth George are attributed statements such as this:

On December 31, 1938, Mary Alice was visiting her father and asked if she could not be alone with him for a few minutes. Lizz shook both of her fists in her sister's face and exclaimed,

"Damn you, you can't talk to father alone in here! I know what you want to talk about."

She then seated herself across the room.

Nothing will be accomplished by reciting more evidence. The record is voluminous. We have selected the evidence most favorable to contestants, for the purpose of discussion, assuming that it was all admissible. It is sufficient to form a basis for our conclusions herein.

It is reasonable to believe from the above evidence and such of a similar nature that there was a desire on the part of Weldow to unduly influence his father in the distribution of his property. This cannot very well be said of Elizabeth, however, even though she may have benefited as a result of the desires of her brother. But, does the evidence actually show that deceased was laboring under undue influence at the time of the execution of the will? Does it show that he did something he would not have done but for the influence exerted upon him by Weldow? It makes little difference how hard Weldow labored to accomplish the undue influence attributable to his desires,

if as a matter of fact the father was willing that he and Elizabeth have the property.

The bulk of the property covered by the will had been deeded to Weldow and Elizabeth from three to five years prior to its execution. This may indicate influence by those two, but not necessarily undue influence. There is no evidence that either Weldow or Elizabeth was the source of the idea of recognizing those conveyances in the will. That originated with the attorneys. Assuming that the father was dissatisfied with what he had done by those deeds, plenty of time had elapsed for him to have changed his mind, and to have concluded that the transfers were what he desired after all. On January 4th, 1939, other sons and daughters had served him with the guardianship papers, an act which upset him considerably. It is just as reasonable to believe that he cut them off on account of that incident as it is that the desires of Weldow were governing his acts at the time, assuming that the evidence concerning the acts of Weldow be treated as sufficient to indicate the exercise at that time and by him of undue influence upon deceased. It cannot be said that the burden of proof has been substantiated if the evidence produces opposing alternatives of equal weight.

But there is another rule of law applicable to this case and very important here. It is this:

" 'Declaration of the testator not made contemporaneously with the execution of the will or so near thereto as to constitute a part of res gestae, are not competent as direct or substantive evidence of the truth of the matters therein stated,' but 'are admissible to show the testator's state of mind, his susceptibility to and effect of undue influence; provided, they are not too remote and there is independent evidence tending to show undue influence inducing the execution of the will." Quoted in Re Goldsberry Estate above.

In considering the statements of deceased set out above, we must not take the facts therein stated to be true, but we may look at those statements to ascertain the state of mind of deceased at the time they were made. If that was

a state of mind indicative of susceptibility to undue influence, or indicative of a mind that was unduly influenced, then we should see that condition of mind continued to the date of execution of the will. If it did, then we should determine if there is independent evidence of undue influence being practiced upon deceased. If there is, then the whole matter should be submitted to the jury. If not, then the court should direct a verdict. In this case the independent evidence of undue influence is absent, and there is no showing of a continued state of mind subject to undue influence, assuming we concede that deceased was subjected to undue influence in years gone by.

In view of the fact that neither the contention of testamentary incapacity nor that of undue influence is supported by substantial evidence, it is necessary and this court so orders that the case be remanded to the lower court with directions to vacate the judgment and enter a judgment of no cause of action in favor of proponents of the will, and to admit the will to probate in so far as the issues decided in this case are concerned.

MOFFAT, C. J., and LARSON, J., concur.

WOLFE, Justice (concurring in part, dissenting in part).

I concur in the opinion that there was no substantial evidence on the issue of testamentary capacity. That issue should not have been submitted to the jury. It appears further that the trial court may have erred in admitting some of the evidence offered by the contestants of the will, and in some of its instructions to the jury. Instruction No. 17, particularly apears to be questionable.

It is not necessary in this opinion to determine whether such instructions and the admission of the evidence in question were error. I am of the opinion, however, that the case should have been remanded for a new trial rather than for a judgment of no cause of action.

I cannot agree that there was a lack of substantial evidence on the issue of undue influence. As discussed in the prevailing opinion, the facts bearing on this issue clearly constitute a jury question. That opinion states that at most the probative facts relating to undue influence are deceased's physical condition, the designation of two children as sole beneficiaries, Weldow's activities in obtaining counsel and witnesses for the will, and remarks made by Weldow and Elizabeth when the guardianship papers were served. However, the opinion later discusses at some length other facts bearing on this issue, dating from 1924 to the date of the execution of the will. Elizabeth and Weldow had been in close contact with the deceased for 15 years. There was evidence that in later years, this association led to an almost total exclusion of the other children from their father. These two children had taken conveyances to his principal pieces of property for little or no consideration. Statements of deceased during that period could be interpreted to show a state of mind indicating a fear of, and subservience to Weldow's demands. Evidence of these facts was presented to show a chain of circumstances indicating undue influence exercised by Elizabeth and Weldow, particulary the latter, as admitted in the majority opinion, over a period of years. The jury could have concluded that the two proponents took advantage of the filing of the guardianship papers, by their statements and actions, so as to impel the deceased to the execution of the will, thus forging the final link in that chain.

Adopting the language of the prevailing opinion, it may be just as reasonable to believe the deceased cut the contestants off on account of the incident of the guardianship papers, as it is that the desires of Weldow were governing the deceased's acts at that time. But that definitely presents a jury question. It is not our office to decide whether the opposing alternatives were of equal weight or whether there was a preponderance on one side. We must concern ourselves solely with the question of whether or not there

was substantial evidence on the issue. The record and the majority opinion clearly show such substantial evidence on this point.

McDONOUGH, Justice (concurring in part, dissenting in part).

I concur in the reversal of the judgment but dissent from the order directing that judgment be entered against contestants and in favor of proponents of the will. I am of the opinion that a new trial should be ordered for the reasons stated in the opinion of WOLFE, J.